1841.

Rose
v.
Clark.

---

Rose and others, *appellants, vs.* Clark, administrator, &c.
*respondent.*

The death of one of the next of kin of the intestate, within the time fixed by the revised statutes for calling the administrator to account, does not entitle the surviving next of kin of the intestate to the whole of the personal estate ; but the share of such deceased next of kin is vested, and belongs to his or her personal representative.

Any mutual agreement between a man and woman to be husband and wife *in præsenti,* especially if followed by cohabitation, constitutes a valid and binding marriage ; where there is no legal disability on the part of either to contract matrimony.

An actual marriage may be presumed from matrimonial cohabitation, and the acknowledgments of the parties that they are husband and wife.   And even where such matrimonial cohabitation commenced between the parties under a contract of marriage which was void, a subsequent marriage after the removal of the disability may be presumed, from acts of recognition by the parties of each other as husband and wife, and from continued matrimonial cohabitation, and general reputation.

But the mere fact that a man and woman live together, and carry on an illicit intercouse, is not s fficient to raise a presumption that they are married.   Such presumption only arises from matrimonial cohabitation ; where the parties not only live together as husband and wife but also hold themselves out to the world as sustaining that honorable relation to each other.

January 25.   This was an appeal from a sentence or decree of the surrogate of the county of Rensselaer, declaring that Abigail Rose, the respondent's intestate, the widow of John Rose deceased, became entitled to one third of his personal estate ; and decreeing payment thereof to the respondent as her personal representative.

From the testimony in the case it appeared, that a little more than fifty years since, Abigail Rose, then Abigail Roberts, was married to Jonas Frink, at Hoosick, and that after living together a short time they separated ; that some time afterwards Frink married another woman and removed

with her to the state of Massachusetts, and continued to reside with her there several years, and had children by her. Frink subsequently came back to Hoosick, and was in the poor-house there. He was at the city of Troy in 1830, and was taken to the house of industry, where he died on the 24th of October in that year. Some ten years after Mrs. Rose and her husband Frink had parted, she was living with J. Owens as his housekeeper. She was there married to S. Thurston, who left her the next day and never after claimed her as his wife. She afterwards continued to live with Owens as his wife, and passed by his name until his death, in March, 1826. Two or three years after Owens' death she was married to Rose, at Stephentown, in the county of Rensselaer ; and she and Rose resided and cohabited together. as husband and wife until the death of Rose, in January, 1838. Both of them sustained fair characters during that time ; and Rose frequently, after the death of Frink, recognized her as his wife. Among other acts of recognition, he joined with her, in February, 1831, in a deed of lands, in which she was described as his wife. It also appeared that she was recognized by the children of Rose as his wife, and their step-mother, down to the time of his death. The petition to the surrogate for letters of administration upon the estate of Rose, stated that he died leaving a widow ; and her renunciation of the administration as such widow was filed with the surrogate, and letters of administration were thereupon granted to one of the sons, and E. Brown, another of the appellants. Mrs. Rose died shortly afterwards, and letters of administration on her estate were granted to the respondent, in April, 1839. The personal representatives of Rose, upon being indemnified by the next of kin, paid over the whole estate to them ; including the third thereof claimed by the representative of the widow. Upon these facts the surrogate decided that the marriage to Rose during the life of Frink was void ; but that the facts and circumstances proved were sufficient to warrant the inference of an actual marriage subsequent to the death of Frink, the first husband. He therefore de-

cided and decreed that she was entitled to one third of the personal estate at the time of her death, and that it belonged to the respondent as her personal representative ; and he ordered the administrators of Rose to pay the same to him, with interest and costs. From this decree the administrators and next of kin of Rose appealed to the chancellor.

*D. Gardner,* for the appellants. No right could vest in Abigail Rose, until after or at the time of accounting fixed by the revised statutes. (2 *R. S.* 92, § 52 ; *p.* 95, § 70, 71 ; *p.* 94, § 63 *to* 65 ; *p.* 96, § 75, *sub.* 1, 4 ; *p.* 114, § 9.) Her right was like that of Schuyler, the husband, in the case of *Schuyler and others* v. *Hoyle,* (5 *John. Ch. Rep.* 196, 209, 210,) and not having been perfected, passed at her death to the next of kin of John Rose. (2 *Kent's Comm.* 421, 422.) The personal property was legally in the administrators of Rose until account. (2 *R. S.* 87, § 25, 27 ; *p.* 447, § 1 ; *p.* 113, § 2, 3. 1 *Cowp. Dig. B.* 10, 466.) The marriage of John Rose and Abigail, as established by the witnesses, was ten or twelve years before January, 1840. As this was proved on the part of the administrator of Abigail, it excludes all presumption. All the witnesses agree that there was no new marriage. Clark, the administrator, is concluded from alleging any other than the marriage he proved as the basis of his right. (19 *Wend.* 319.) A subsequent marriage cannot be presumed. (*Jackson* v. *Davis,* 5 *Cowen,* 131, 132. *Parker* v. *Foote,* 19 *Wend.* 315, 316. *Miller* v. *The Resolution,* 2 *Dall.* 122.) After Abigail's marriage with Solomon Thurston was proved, a prior marriage could not be proved with Frink, either by her or her administrator. (*Rea* v. *Smith,* 19 *Wend.* 295. *Cro. Jac.* 270. *Doug.* 450. *Armstrong* v. *Toler,* 11 *Wheat.* 261. *Russell* v. *Rogers,* 10 *Wend.* 478. *Burt* v. *Place,* 6 *Cowen,* 431. *Best* v. *Strong,* 2 *Wend.* 309, 326. *Marbury* v. *Brooks,* 7 *Wheat.* 567, 575, 578. 15 *Wend.* 311, 412, 416. *Bolt* v. *Rogers,* 3 *Paige,* 154. 2 *Wheat.* 153. 6 *Paige,* 108. 1 *Maule & Selw.* 751.) In *Gaylord* v. *Van Loan,*

(15 *Wend.* 311,) the court say a " man is estopped from averring or proving his own fraud." Abigail's marriage with Thurston being proved, she was estopped in pais from averring or proving that such marriage was a criminal act by proving her prior marriage with Frink. On this ground this proof was objected to. The proof of the prior marriage ought to have been rejected by the surrogate, and ought now to be rejected as illegal. This would leave Thurston, Abigail's husband, living down to the death of John Rose, and would be conclusive. No presumption can be made of any second marriage with Rose, as the proof is against it. And no presumption of Abigail's regard for law can be drawn from the facts, as she is proved to have married Thurston, Owens and Rose, while her first husband, Frink, was alive and known to be alive by her. And the testimony shows that she concealed her prior marriage from Rose. The surrogate decreed Abigail's marriage with John Rose void. As it is proved that no new marriage took place, the residue of the decree must be reversed.

*S. G. Huntington,* for the respondent. The validity of the marriage of John Rose and wife cannot be brought in question ; both parties being dead. (2 *Comyn's Dig.* 293. 2 *Starkie's Ev.* 221.) The representatives of Abigail Rose were entitled to her distributive share, although she died within a year after her husband. (*Toller's Law of Ex'rs,* 342, 386. 8 *Petersd. Abr.* 450. 1 *Comyn's Dig. tit. Administration,* H. 2 *Wn's. Ex'r,* 936.) Frink died the 24th of October, 1830, and the marriage of John Rose and Abigail took place subsequent to his death. This is proved by cohabitation and reputation ; and by the execution of the deed by Rose and wife to Smith, dated 25th of February, 1831, and by them duly acknowledged. (2 *Kent's Com.* 76, 87, 79, *n.* 2 *W. Black.* 377. 4 *John. R.* 52. 18 *Id.* 346, 350. 1 *Edw. Ch. R.* 377. 19 *John. R.* 347.) If the marriage took place since 1830, it was valid until pronounced void by the chancellor. (2 *R. S.* 139, § 6. *Id.* 142, § 20. 6 *Paige's R.* 210.) Abigail Rose, since

the death of John Rose, has been treated and considered by the heirs and next of kin of Rose as his widow, by their applying to and obtaining from her a renunciation of her right to the administration of her husband's estate. The administrators also treated her as the widow of Rose, by setting off to her as widow certain property, which by law belonged to her, and to which she was only entitled as such widow. The administrators, also, in their petition, verified by their oath, stated that Rose left her his widow him surviving. These several acts of the administrators and heirs and next of kin estop them from denying that she is the lawful widow of John Rose. The objection to the admissibility of the evidence to prove that Abigail Rose was the lawful wife of Jonas Frink at the time of her pretended marriage with Solomon Thurston was properly overruled, as it was to show the marriage with Thurston null and void.

THE CHANCELLOR. The appellants' counsel insists, among other things, that by the death of Mrs. Rose, within the time fixed by the revised statutes for calling the administrators to account, the whole estate of her deceased husband went to his next of kin. In this, however, the construction which the counsel supposes to be given to the first and fourth subdivisions of the seventy-fifth section of the title of the revised statutes relative to the duties of executors and administrators in rendering an account and in making distribution to the next of kin, is clearly wrong. Although the statute allows to the administrators eighteen months after the death of the intestate to get in the estate, pay the debts, and prepare for a final settlement of their accounts, it was not intended to prevent the vesting of the distributive shares of the widow and next of kin in the meantime. The English statute of distributions contained a similar provision, that no distribution of the estate of the intestate should be made till after one year from his death. (22 *and* 23 *Charles* 2*d, ch.* 10, § 8, 2 *Evans' Stat.* 359.) Yet, within a very few years from the passing of that statute, in the case of *The Earl of*

*Winchelsea* v. *Norcliff*, (1 *Vern. Rep.* 403,) the court of chancery decided that where a person entitled to a distributive share of the intestate's estate died before distribution, and within the year, there was an interest vested ; and that his share should go to his executor or administrator. And such, I believe, has been the uniform construction of the statute of distributions ever since that decision. That the legislature in the recent revision did not intend to change the settled rule of law as to the time of the vesting of the distributive shares of the intestate's personal estates, is also evident from the third, sixth, seventh and eighth subdivisions of this seventy-fifth section ; which clearly refer to the death of the intestate, and not to the time when the distribution is actually required to be made. (2 *R. S.* 96.) The expression, " if there be no widow," in the fourth subdivision, must, therefore, be construed to relate to the time of the death of the intestate also ; so as to give her a vested interest in her distributive share of the estate, although she dies within the eighteen months allowed by the statute to the administrators to prepare for the settlement and distribution of such estate.

By the ancient common law of England, it seems that a marriage was invalid unless it was celebrated *in facie ecclesiæ.* Such was the decision in the case of *Del Heith*, decided in the beginning of the fourteenth century, (*Easter Term*, 34 *Edw.* 1 ;) the report of which case Sir Harris Nicolas has extracted from the Harlean Manuscript, No. 2117, fol. 339. (*See Nicolas' Adult. Bast.* 31, 567.) And the decision in *Foxcroft's case*, twenty-four years previous to that time, (*Easter Term*, 10 *Edw.* 1, 1 *Roll. Ab.* 359,) undoubtedly was placed upon the same ground ; and not upon any question of doubt as to the supposed husband being the real father of the child, as Lord Ch. J. Ellenborough and Lord Chancellor Eldon appear to have understood the decision in that case. (*See King* v. *Luff*, 8 *East's Rep.* 299. *Le Marchant's preface to the Gardner Peerage case*, 50. *Nicolas' Adult. Bast.* 560.) The law on this subject, however, was unquestionably changed at

1841.

Rose
v.
Clark.

the reformation, if not before. For it is now a settled rule of the common law which was brought into this state by its first English settlers, and which was probably the same among the ancient protestant Dutch inhabitants, that any mutual agreement between the parties to be husband and wife *in presenti*, especially where it is followed by cohabitation, constitutes a valid and binding marriage ; if there is no legal disability on the part of either to contract matrimony. (2 *Kent's Com.* 87.)

The only real question in this case therefore is, whether the surrogate was authorized to infer that such a contract of marriage had been made, subsequent to the death of Frink, from the facts and circumstances which were in evidence before him. That an actual marriage may be inferred, in ordinary cases, from cohabitation, acknowledgments of the parties, &c. as well as by positive proof of the fact, there can be no room to doubt. (*See Math. on .Pres. Evid.* 283, *and cases there cited.*) And the only doubt in this case arises from the proof of the fact that the matrimonial cohabitation between these parties commenced, previous to the death of the first husband, under a contract of marriage which was absolutely void previous to the revised statutes ; although neither of them may have known at that time that Frink was still living. (*Valleau* v. *Valleau*, 6 *Paige's Rep.* 210.) It appears, however, from decisions in our own courts as well as in England, that a subsequent marriage may be inferred from acts of recognition, continued matrimonial cohabitation and general reputation ; even where the parties originally came together under a void contract of marriage. The case of *Wilkinson* v. *Payne*, (4 *Durn. & East's Rep.* 468,) carried the doctrine of presumption to a very great length on the subject. There the marriage was absolutely void under the English marriage acts ; for the husband, whose parents were dead, was under age at the time the ceremony was performed, and had no legal guardian to consent to the marriage. And when he afterwards became of age his wife was upon her death bed, and actually died in three weeks

from that time.  But upon proof that the father of the wife, who was the defendant in that suit, and the rest of his family, had always treated them as husband and wife, Justice Grose, before whom the cause was tried, left it to the jury to presume a legal marriage after the husband was of age ; which they did.  And the court of king's bench refused to disturb their verdict.  In *Fenton* v. *Reed*, (4 *John. Rep.* 52,) the question was, whether Mrs. Reed, the plaintiff in the suit before the justice's court, was the widow of W. Reed ; to whom she was married in 1792, upon the supposition that her first husband, who was then absent, was dead.  It appeared by the evidence that the first husband returned soon after the marriage, and lived until June, 1800, when he died.  But the wife continued to cohabit with Reed as her husband until his death, in 1806, and no solemnization of marriage was proved to have taken place between her and Reed subsequent to the death of the first husband.  Yet the supreme court decided that the court below was authorized to presume a marriage subsequent to that time.  The same principle of presumption was sustained by the supreme court in the subsequent case of *Jackson* v. *Claw*, (18 *John. Rep.* 346,) where the marriage took place while the first wife was living ; but where the matrimonial cohabitation continued for many years after she, from her continued absence, was presumed to be dead.

These cases I think fully sustain the decision of the surrogate in the case now under consideration.  Here the parties lived together as husband and wife for more than seven years after the death of Frink, and sustained fair characters. The children also, who now contest the claim of the representatives of the widow, recognised her as the wife of the intestate, and called her mother ; which they certainly would not have done if it had been understood in the neighborhood, or in the family, that her cohabitation with the father was meretricious ; as the intercouse with Owen some years previous probably was.  The fact that she joined with the intestate in a conveyance of his land, subsequent to the death of Frink, for the purpose of barring her right

1841.

Rose
v.
Clark.

of dower, is also a strong circumstance in favor of the pre=
sumption that both parties at that time considered them-
selves as husband and wife. And the intestate ever after-
wards called her his wife when speaking of her to others.
The administrators also recognised her as the widow of the
decedent, both in their petition for administration and in
the inventory of the estate. After all that had transpired
previous to the death of the intestate, I think he would
have been precluded from denying that she was his wife, in
January, 1838 ; according to the cases of *Hervey* v. *Hervey*,
(2 *Wm. Black. Rep.* 877,) and *Purcell* v. *Purcell*, (4 *Hen.
& Mumf.* 507.) And if the evidence was sufficient to raise
the presumption of a legal marriage as to him, in his life
time, it must necessarily be sufficient to entitle her repre-
sentative to the widow's portion of the estate, under the
statute of distributions.

To guard against any misconstruction as to the princi-
ple of presumption adopted in this and other cases of the
same character, it may be proper to say, that the mere fact
of a man and woman's living together and carrying on an
illicit intercouse, is wholly insufficient to raise a legal pre-
sumption of marriage ; as it too often happens that such
cohabitation takes place when the intercourse between the
parties is clearly meretricious. The presumption of mar-
riage only arises from matrimonial cohabitation ; where
the parties not only live together as husband and wife, but
hold themselves out to the world as sustaining that honor-
able relation to each other. The first kind of cohabitation,
from which ·no presumption of marriage arises, although
the man, under particular circumstances, sometimes may
have attempted to give to his mistress a different character
from that which she in fact sustained towards him, is fully
illustrated by the case of *Cunningham* v. *Cunningham*, in
the house of lords, upon an appeal from Scotland, (2 *Dow's,
Parl. Rep.* 482.) In relation to that case it is only neces-
sary to remark that I fully concur in the conclusion at
which Lord Eldon and Lord Redesdale arrived, and in the
reasoning upon which that conclusion was based ; and which

are perfectly consistent with the decisions in the supreme court of this state to which I have referred.

The decree of the surrogate must, therefore, be affirmed with costs; and interest upon the amount decreed to be paid by the surrogate from the time of such decree, as damages for the delay and vexation caused by such appeal. (2 *R. S.* 618, § 35.) And if the amount decreed to be paid with costs and interest is not paid within the time prescribed by the order of the surrogate, the respondent is at liberty to have the decree of affirmance enrolled here, and to take out execution thereon.