Denio, C. J.
The plaintiff, Phila Cheney, claims to be the daughter of Charles Harris, who is admitted to have been seized of the premises, claimed in this action, and she seeks to recover as his heir. The defendant claims under a conveyance from her mother, Betsey Pike, formerly Betsey Harris; and he insists that the plaintiff is not the legitimate daughter of Charles Harris, and cannot therefore inherit from him, though it is not denied that she is his natural daughter.
Upon the question of the plaintiff’s legitimacy there was no room for controversy about the facts. It was proved by the plaintiff’s own witness, Betsey Pike, that when her daughter, the plaintiff, was born she had not been married to Charles Harris, the plaintiff’s father. She swore, how ever, that there was a mutual engagement between them to be married to each other at some future time, and that after such engagement the plaintiff was begotten, and that their marriage was actually celebrated a few months after the plaintiff’s birth. There was no cohabitation between them as husband and wife; they did not hold themselves out, and they were not recognized by their relatives or acquaintances, as married persons until the formal marriage. The plaintiff was, however, brought up by them and always recognized as their daughter. The plaintiff’s counsel maintains that mutual promises to marry, followed by carnal *347 intercourse, is a legal marriage, and that the judge consequently committed an error in submitting the question to the jury whether the engagement was that they would presently take each other as husband and wife, or whether it was executory in its character; as he maintains that in either case they became husband and wife from the time the intercourse commenced. I agree that there was nothing to be left to the jury, for there was no disputed question of fact. There was no agreement between the parties to become husband and wife in presenti, but there was an agreement to be married in futuro, and that was followed by carnal intercourse; and if that constitutes a marriage by our law, they were married and the plaintiff is legitimate, otherwise she is not.
There is a dictum by Judge Cowen, in Starr v. Peck (1 Hill, 274), which fully sustains the plaintiff’s position; but it was unnecessary to the decision. It was a case in which the jury were left to presume a marriage in fact, by which I understand a present contract, from the conduct of the parties; and the verdict affirmed the existence of a carriage. There was no evidence of a contract, present or future, and it was as easy for the jury to find the one as the other. What was said by the learned judge as to a contract per verba de futuro was obiter. Chancellor Kent also countenances the position of the plaintiff’s counsel. He says: “ If the contract be made per verba de presentí and remains without cohabitation, or if made per verba de futuro and be followed by consummation, it amounts to a valid marriage in the absence of all civil regulations to the contrary.” (2 Com., 86, 2d ed.) Blackstone too says that in cases of cohabitation, contracts per verba de futuro were, before the marriage act, deemed valid marriages for many purposes, and the parties might be compelled, in the spiritual courts, to celebrate them in facie ecclesia. Notwithstanding these respectable opinions, I have not been able to assent to the proposition. With us marriage is simply a *348 civil contract, differing, it is true, from contracts upon other subjects in the circumstance that it is not in the power of the parties to release or dissolve it, but partaking in many other particulars of the nature of common law contracts. It requires the existence of two parties, of different sexes, competent to contract, and an actual contract between them. Like other contracts, it may be in terms and intent executory or executed. If executed, that is, if the parties agree eo instanti to take each other for husband and wife, it is ipsum matrimonium. If executory in its terms it would not, by any analogy to common law contracts, create the relation of husband and wife. It would bind the parties to enter into these relations in future, and, viewed as an agreement to marry, it confessedly does furnish the basis of an action for damages. If it were like some other common law contracts, an action in the nature of a bill in equity might be sustained to enforce a specific performance. But the temporal courts in England never possessed a jurisdiction to enforce matrimonial contracts specifically, and we have no tribunals corresponding with the English ecclesiastical courts, which did formerly exercise such a jurisdiction. (Burtis v. Burtis, Hopk, 557.) Our courts have all the jurisdiction of the English common law and equity courts which has not been denied them by the legislature, and such other jurisdiction as has been conferred upon them by statute. But as these English common law courts never had any authority to decree a marriage upon the ground of an executory contract to marry, and we have no statute creating such a jurisdiction, it follows that if parties agree to marry and one of them refuse to perform the agreement, no power exists in our courts to compel a performance. So far, then, as the analogies between agreements to marry and other executory contracts carry us, the only effect of tho former is to lay the foundation for an action for damages in case of a breach. Carnal intercourse without marriage does *349 not create any legal relation between the parties or confer any rights upon the issue of such connection.
If by the law of England, as it existed at the revolution and as it was then administered in the temporal courts, an agreement to marry, followed by intercourse, constituted marriage, then, as we have adopted that system, and no change in that particular has been made by statute, we must hold that the plaintiff’s parents were married before she was born and that she is legitimate. It is clear that such a doctrine existed in the canon law; and that system, with some modifications, was, in a general sense, the basis of the matrimonial law of the nations of Europe, England included. (Dalrymple v. Dalrymple, 2 Hagg.,. 54.) It was the law of the church and was administered in the spiritual courts. Marriage contracts, whether by words in the present tense or per verba de futuro, which were followed by consummation, were not considered perfect marriages, but the spiritual courts had a jurisdiction to compel their due celebration in facie ecclesice. In the mean time a certain effect was given to them before celebration. The parties were for some, and perhaps for most, purposes considered as husband and wife. The present question is, how far the law of England regarded such irregular marriages as sufficient to predicate legitimacy of the offspring. Sir William Scott (afterwards Lord Stowell), in his masterly judgment .in Dalrymple v. Dalrymple, after stating the doctrines of the canon law, to the effect above mentioned, adds that “ the common law certainly had scruples in applying the civil rights of dower and community of goods and legitimacy in the cases of these looser species of marriage.” The English marriage act of 26 George II., ch. 33, passed in 1753, as is well known, required marriages to be celebrated in a parish church by banns, or by license, and declared all other marriages, with certain exceptions, to be void. It never applied to the colonies and had no force here. It abolished in express *350 terms the jurisdiction of the spiritual courts to compel the celebration of a marriage by reason of any contract of matrimony whatever. (§ 13.) It is extremely difficult to ascertain what the English matrimonial law was, prior to this statute, and what it now is in cases to which the statute does not extend. Upon the question whether contracts by present words or by agreement looking to the future for its performance, with carnal intercourse but without a formal celebration, amounted to a legal marriage, the cases are numerous and conflicting. Some of them, containing dicta which would seem to support the proposition contended for by the plaintiff’s counsel, are referred to by Judge Cowen. The question has been examined with industry and care by Mr. Jacob, in his Addenda to Roper’s Treatise on Husband and Wife. (Roper, 445.) He has collated, with great discrimination, all the judgments and dicta, together with the conclusions of the text writers and the various statutes on the subject passed prior to the act of George II., and he comes to the confident conclusion that such contracts as we are considering “ did not confer on the woman the right to dower, on the man the right to the woman’s property, or on the issue the right of legitimacy, and that it did not render a subsequent marriage with a third person ipse facto void at law, though it formed a ground for sentence (in the spiritual courts) annulling it. The authorities,” he adds, “ seem to show that, according to the ecclesiastical law, the contract did not give any right except to call for a performance of it by actual solemnization, not justifying cohabitation or conferring conjugal rights; and that at the common law it had no effect, though in cases where the parties cohabited and were reputed to be man and wife this might afford sufficient evidence for the purpose of some actions in which-strict proof was not required.” Among the authorities referred to, to sustain this opinion, is the speech of Lord Mansfield, then solicitor-general, on introducing the mar *351 riage act into parliament. He is reported to have said:
“ I believe it will be allowed, if a man and woman seriously and sincerely enter into a marriage contract without the interposition of a clergyman or any religious ceremony whatever, it will be a good marriage both by the law of God and the Haw of nature; yet the law of this society, and I believe of every other Christian society, has declared it not to be a good marriage.” Without further comment on the authorities upon which this writer relies, which have, however, been attentively examined, I am prepared to adopt his conclusion as to the state of the law of England prior to the marriage act. It follows that the doctrine of the' canon law, that a contract of marriage per verba de futuro, followed by carnal intercourse, was a valid marriage, did not become the law of this state by force of our adoption of the common law of England, for it was not a part of that common law. Should it be said that this course of reasoning would repudiate marriages per verba de presentí without solemnization, I answer that the validity of such marriages is firmly established by judicial decisions in this state which we are not at this day at liberty to question (Newton v. Reed, 4 John., 52; Jackson v. Clow, 18 id., 346; Jackson v. Winne, 7 Wend., 47; Rose v. Clark, 8 Paige, 574; In the matter of Taylor, 9 id., 611; Clayton v. Wardell, 4 Comst., 230); but there is no judicial authority with us in favor of inferring a marriage from an executory agreement followed by intercourse, except the dictum in Starr v. Peck to which I have referred. But I think the validity of marriages by words of present contract can be shown independently of those cases. Marriage, so far as personal rights and the rights of property were concerned, has always been a civil contract, requiring only the present assent of parties competent to contract and such ceremonial observances as the positive municipal law had prescribed. At, the reformation the ritual of the reformed Church of England, established by act of parliament, prescribed the *352 form of the marriage ceremony, which was to be celebrated, through the ministry of the priest, in facie ecclesice. There was at the same time an ecclesiastical judicature, with jurisdiction over questions of marriage and divorce. In adopting the common law purely, the prescriptions of the prayer-book and the laws concerning the ecclesiastical judicature disappeared from the system. We inherited simply the principle which declared marriage to be a civil contract. The common law itself supplied us with all necessary rules for determining the requisites for entering into the contract, and moreover prescribed the legal relations established by and the legal consequence which followed a valid marriage. The principle that a promise, followed by intercourse, was in some sense a marriage, was a branch of the ecclesiastical system resultin. from the acknowledged jurisdiction of the ecclesiastical courts to compel the performance of such marriages by spiritual censures. Having dispensed with that jurisdiction, we cannot consistently acknowledge any marriage to be valid which requires the intervention of a spiritual court to make it perfect. We must insist upon those circumstances ' which the law requires in an executed contract upon any other subject. Mutual promises to marry in future are executory, and whatever indiscretions the parties may commit after making such promises, they do not become husband and wife until they have actually given themselves to each other in that relation. That this has been the sense of the legal profession and of the courts is evident from the rules relating to several actions in common use. If a man seduce a woman under a promise of marriage, we allow an action for the seduction at the suit of the father, and an action for a breach of the promise at the suit of the daughter. (Foster v. Scofield, 1 John., 297; Gillet v. Mead, 7 Wend., 193 ; Brownell v. McEwen, 5 Denio, 367.) According to the plaintiff’s argument both actions would be absurdities; for the marriage being complete by *353 the act complained of, there would be no seduction and no breach of promise. So in the action for a breach of a promise of marriage, if it appear that the plaintiff, on the faith of the defendant’s promise, has been seduced by him and has become enciente, it is considered as a circumstance of great aggravation and the damages are proportionably increased ; whereas, if the plaintiff’s position is sound, the defendant by the very act has made all the reparation in his power and has become the husband of the plaintiff. The legislature, moreover, has not understood the law as the plaintiff does. By an act passed in 1848 (Session Laws, ch. III) the seducing and having illicit conversation with an unmarried female under promise of marriage is made a misdemeanor punishable by imprisonment; but the offence may be absolved by a subsequent marriage. The legislature intended by this enactment to protect female purity and not to deprive a wife of her lawful husband.
The foregoing considerations have" satisfied me that the plaintiff’s doctrine is not the law of this state. No evidence was produced respecting the matrimonial law of Rhode Island. In the absence of such evidence we are to intend that it is the same as our law.
It follows from what has been said that the plaintiff is not the legitimate child of Charles Harris. She cannot consequently recover as his heir. When she had shown the facts respecting her legitimacy, the judge should have decided the case upon the question of law and have directed a verdict for the defendant. She cannot complain of directions which gave her a chance for a verdict to which she was not entitled.
The judgment should be affirmed.
Bowen, J., also delivered an opinion for affirmance, and all the judges who had heard the argument concurred.
Judgment affirmed.