NEW YORK COUNTY. — HON. D. G. ROLLINS, SURRO-GATE.—June, 1886.

## STANLEY *v.* STANLEY.

*In the matter of the estate of* MARCUS C. STANLEY, *deceased.*

Two persons, each asserting herself to be the widow of an intestate, and one of whom is a petitioner for the revocation of letters of administration already granted to the other, occupy the same position before the court, as regards proof of their respective claims to such *status*, as if they had simultaneously applied for appointment.

Where a relation nominally matrimonial is shown to have been in fact meretricious in its origin, it will be presumed to have continued such, in the absence of evidence that, somehow, somewhere and at some time, its character was changed.

For several years preceding the year 1857, decedent and A. cohabited in the city of New York, as if husband and wife. When the cohabitation began, the woman, A., was incapable of contracting marriage, she having a husband then living ; and after it ceased, decedent was formally married to B. The separation between decedent and A. was not attended with the circumstances naturally occurring in case of the severance of marital relations,—the latter having never attempted a vindication of her conjugal rights, until she procured letters of administration of his estate.—

*Held*, that A.'s relations with decedent, being illicit at the outset, must be presumed to have continued to possess that character until the marriage of the latter ; and that her letters of administration should be revoked.

Hynes v. McDermott, 91 *N. Y.*, 451—distinguished.

PETITION by Emma L. Stanley, claiming to be decedent's widow, for the revocation of letters of administration issued to Eliza C. Stanley. The facts are stated in the opinion.

JOHN D. TOWNSEND, *for petitioner.*

IRA SCHAFFER, *for administratrix.*

THE SURROGATE.—This decedent died on the 9th of July, 1885.   On the 15th of the same month, Eliza C. Stanley, claiming to be his widow, was, upon her own petition, appointed administratrix of his estate. Proceedings to revoke her letters as such administratrix were begun on July 24th, 1885, by Emma L. Stanley, who alleged, in her petition for such revocation, that she herself was the lawful wife of the decedent at the time of his death, and that, accordingly, she, and not the respondent, was entitled to administer upon his estate.   Upon the filing of this petition, a referee was appointed to take testimony in the proceeding for revocation and to report the same to the Surrogate.

I am now to determine, upon such portion of the testimony returned by the referee as I have not directed to be stricken from the record upon the motion of one or the other of the parties hereto, whether it is the petitioner or the respondent who can lawfully lay claim, as the widow of this decedent, to letters of administration.

That Emma L. Stanley, the petitioner, was formally and ceremonially married to decedent on September 22nd, 1857, is beyond dispute.   Her application must, therefore, be granted, unless I am justified in finding upon the evidence before me that, when that marriage was solemnized, the decedent was incapable of contracting the same, by reason of his having theretofore become and his then being the lawful husband of this respondent.

At some time prior to October, 1849, Eliza C. Stanley was married, and, for aught that appears, law-

fully married to one Richard Tombs.   By a decree
of the Court of Common Pleas of this county the two
were in that month divorced upon the ground of the
wife's adultery with Marcus Cicero Stanley.   It is
conceded, by the defendant in that action for divorce,
that the cohabitation between herself and.Stanley,
which was undoubtedly continued for several years,
began meretriciously while she was the lawful wife of
Tombs.   She testified before the referee in the pres-
ent proceeding that, after she had given birth to a
child, of whom Stanley was the father, she was in-
formed by Stanley and by other persons whose names
she was unable to specify, that Tombs was no longer
living.   She further testified that, after the receipt of
this intelligence she was formally married to the dece-
dent by. Barnabas W. Osborne, then a police magis-
trate of this city.   Her statements are very vague
and unsatisfactory as to the date .when this alleged
marriage took place, and the claim that it ever did
take place finds no support in the evidence apart from
her own testimony.   Mr. Osborne was produced as a
witness by the petitioner.   He swore that he had no
recollection of ever performing such marriage cere-
mony, and was confident that he never did perform it.
He gave, as a reason for this confidence, the fact that,
as a police magistrate, he was rarely called upon to
solemnize a marriage except as incident to bastardy
proceedings, and that, as he was intimately acquainted
with the decedent for many years before and after
the time approximately fixed by the respondent as
the date of her marriage, he could not, if he had sol-
emnized it, have failed to remember the circumstance.

In addition to this testimony of Osborne, the petitioner introduced a deposition made by the decedent himself in 1878 in a proceeding brought under R. S., part 3, ch. 7, tit. 3, art. 5 (3 Banks, 6th ed., 662) for the perpetuation of testimony. In that deposition. the decedent positively denied that any marriage ever took place between himself and this respondent, or that Osborne ever performed any marriage ceremony as the respondent had theretofore alleged. In this state of the testimony, it can hardly be claimed that the fact of such formal marriage has been satisfactorily established. I think it extremely unlikely that it ever occurred, and I find that it never did.

Counsel for the petitioner relies upon the case of Hynes v. McDermott (91 *N. Y.*, 451), as supporting his contention that, even if the respondent's claim of a formal marriage be discredited, a marriage in fact may and ought to be inferred from the relations proved to have existed between his client and this decedent prior to the latter's intermarriage with the petitioner.

That Stanley's cohabitation with the respondent was ostensibly matrimonial, both before and after the respondent's divorce from Tombs, I have no doubt. She passed as his wife at the various places where they resided, and that, too, with his knowledge and approval; and he is shown to have introduced her as such to divers persons who were examined before the referee. Indeed, in October, 1849, he himself swore, in the Tombs divorce proceeding, that, during the three years then last past, this respondent had lived and cohabited with him as his wife, and that, as the

fruits of that intercourse, she had borne two children, of whom one was then two months old and the other of the age of two years. How long this cohabitation between Stanley and the respondent continued after Tombs obtained his divorce is not definitely shown, but it had admittedly ceased altogether before Stanley married the petitioner. Now does its existence while it lasted, and the "habit and repute" which attended it, raise a presumption that prior to September 22nd, 1857, the decedent and Eliza C. Stanley were husband and wife?

Hynes v. McDermott (*supra*) was an action of ejectment in which two children of one William R. Hynes and one Mary E. Hynes sought to recover certain premises whereof their father, who died intestate, had been seized at his death. Their right to recover depended upon the question whether their father and mother had sustained to each other the relation of husband and wife. The evidence showed that the two became acquainted in England, and for several years thereafter, and until Mr. Hynes died, lived in ostensible matrimonial cohabitation in that country. Neither of them was at any time under any disability which forbade a legal marriage with the other. They were never formally married and were, therefore, under the English law, never married at all. On one occasion they visited Paris, France, where their cohabitation continued, and where the woman was introduced by Mr. Hynes as his wife. No proof was given respecting the marriage laws of France, and it was assumed that, in that country as in this State, the agreement of a man and a woman to sus-

tain to each other the relation of husband and wife, followed by a cohabitation, constituted a marriage. The court of Appeals held that upon these facts the jury was authorized in finding, as it did, that the parties, by interchange of mutual consents, had actually contracted a marriage in France. " The presumption of marriage," said ANDREWS, J., pronouncing the opinion of the court, " from a cohabitation apparently matrimonial, is one of the strongest presumptions known to the law.  This is especially true in a case involving legitimacy.  The law presumes morality and not immorality, marriage and not concubinage, legitimacy and not bastardy.  Where there is enough to create a foundation for the presumption of marriage, it can be repelled only by the most cogent and satisfactory evidence."

In considering how far this doctrine is applicable to the case at bar, I have been impressed by the fact that though several decisions of the courts of New York are cited in its support, no reference is made in Hynes v. McDermott to certain others which have a very important bearing upon the present controversy.  The cases cited are Fenton v. Reed (4 *Johns.*, 51); Rose v. Clark (8 *Paige*, 574); and Caujolle v. Ferrie (23 *N. Y.*, 90).  Those to which no allusion is made are Clayton v. Wardell (4 *N. Y.*, 230); Brinkley v. Brinkley (50 *N. Y.*, 198); Chamberlain v. Chamberlain (71 *N. Y.*, 423); Collins v. Collins (80 *N. Y.*, 9); and Badger v. Badger (88 *N. Y.*, 546).  I do not understand that the doctrine asserted in these cases has been overthrown, if, indeed, it has been at all affected, by the decision of Hynes v. McDermott.

In Badger v. Badger (*supra*), FINCH, J., pronouncing the opinion of the Court of Appeals, said:

"The rule that a connection confessedly illicit in its origin will be presumed to retain that character until some change is established, is both logical and just. The force and effect of such a fact is always very great, and we are not disposed in the least degree to weaken or disregard it. Very often the changed character of the cohabitation is indicated by facts and circumstances which explain the cause and locate the period of the change, so that in spite of the illicit origin, the subsequent intercourse is deemed matrimonial; but a change may occur and be satisfactorily established, although the precise time or occasion cannot be clearly ascertained. If the facts show that there was, or must have been, a change; that the illicit beginning has become transformed into a cohabitation matrimonial in its character, it is not imperative that we should be able to say precisely when or exactly why the change occurred."

It is not important to quote from the four other cases last above cited. They seem to sustain the principle that, where a relation nominally matrimonial is shown to have been in fact meretricious in its origin, it will be presumed to have continued meretricious, in the absence of evidence that somehow, somewhere and at some time its character was changed.

Now the case at bar is distinguishable from Hynes v. McDermott, and from every other case whose authority ANDREWS, J., invokes, as supporting that decision, in this notable particular, that here alone a question presents itself as to the effect of conflicting legal presumptions.

The fact that the respondent was more diligent than the petitioner in applying for letters of administration, and that letters have been granted pursuant to her application, manifestly does not put upon the petitioner any burden that she would not have been called upon to bear if both parties to this proceeding had simultaneously appeared before me as rival claimants for letters.  Now, should either of these women be accorded the benefit of a legal presumption as against the other?  Will it be said that the respondent is preferentially entitled thereto because her claim to be the decedent's wife is, in point of time, antecedent to that of the petitioner?  This contention would rest upon a very palpable begging of the very question at issue, which is — *Was* the respondent the decedent's wife at any time?  May not the petitioner invoke for herself and her children the kindly presumption with which the law surrounds one whose matrimonial *status* is assailed?  And may she not, indeed, invoke it with even greater propriety and cogency than the respondent, seeing that the latter's connection with the decedent was admittedly illicit in its origin while he was united to the petitioner *in facie ecclesiæ* in a matrimonial relation which lasted for twenty-eight years and only ended with his life?

A., a woman, claims to have been married to B., a decedent, and to have borne him a child, C.; D., another woman, also claims to have been B.'s wife, and to have borne a child, E., of whom B. was the father. Will the law, in its anxiety to find A.'s morality and C.'s legitimacy, presume that C. was born in wedlock, when the indulgence of that presumption must of

necessity involve the immorality of D. and the illegitimacy of E. ? Such a case would, indeed, fill to the full the measure of what Baron EYRE once characterized as "presumption run mad."

I cannot think that such a doctrine finds any support in the decision of Hynes v. McDermott. In his treatise upon Marriage and Divorce (vol. 1, § 434), Mr. Bishop says upon this subject : "Since people are not to be deemed, without proof, to be living either in crime or in violation of common decency and decorum, the law will presume every couple who dwell together, in the way of husband and wife, to be *prima facie* such in fact. This presumption will prevail in all cases where it is not overcome by evidence or neutralized by a presumption growing out of the special issue or proofs." And the same author, after further discussion of the matter, adds (§ 440): "In general, and by the opinions of most judges, if, while three persons are living, two of them cohabit matrimonially, and then, separating, one of them and the third do the same, no marriage in either instance will be presumed from such cohabitation and repute ; but if the actual fact of marriage is proved as introducing either one of the cohabitations, it will not be invalidated by the evidence of the other."

To similar effect, see Clayton v. Wardell (4 *N. Y.*, 230, 237); Jones v. Jones (48 *Md.*, 391); Breakey v. Breakey (2 *U. C. Q. B.*, 349, 358); Wheeler v. McWilliams (2 *id.*, 77); Case v. Case (17 *Cal.*, 598); Ellis v. Ellis (11 *Mass.*, 92); State v. Hodgskin (19 *Me.*, 155); State v. Roswell (6 *Conn.*, 446); and see especially the opinion of BLACKBURN, J., in Dysart Peer-

age Case (*L. R.*, 6 *App. Cas.*, 489, 534), decided in March, 1881, after the decision in the Breadalbane case (8 *L. R.*, 1 *Sc. & Div. App.*, 182), cited with such marked approval in Hynes v. McDermott.

I find, in the authorities cited, abundant warrant for holding this respondent unentitled to the presumption that her relations with the decedent ever ceased to be illicit and became matrimonial; and even if she could command the aid of such presumption, it would be of little avail to her in the light of all the evidence. By the judgment which divorced Tombs from this respondent in 1849, she was forbidden to marry again during the life of her former husband. For aught that is disclosed by the evidence, Tombs was alive when Stanley married the petitioner, and may, indeed, be alive to-day. The testimony of the respondent, that she was informed by Stanley himself that Tombs had died, and that she heard a report to that effect from other friends whose names she was unable to recall, does not suffice, even if fully credited, to establish the fact of his death or of her competency to become Stanley's wife at any period of their intimacy.

Again : The separation between Stanley and herself was not attended or followed by such circumstances as would naturally attend and follow a separation of husband and wife. She well knew of his marriage with the petitioner at the time it occurred; but though nearly thirty years ensued before his death, she took no steps to disturb that lady's *status* as decedent's lawful wife, or to cause the decedent himself to be prosecuted for bigamy, though all three of the

parties seem to have resided, during the whole period, in the city of New York. The respondent's conduct, and the conduct of her alleged husband, both before their cohabitation began and after it ceased, throw great discredit upon any presumption that can possibly be claimed to exist in favor of their marriage. Circumstances strikingly similar to those upon which I have just commented were the subject of consideration by the Court of Appeals in Chamberlain v. Chamberlain (*supra*), where a ceremonial marriage was sustained as against an earlier relation between the husband and another woman, which earlier relation was claimed to have been evidenced by habit and repute as matrimonal.

See, also, in support of the conclusions I have here reached, Brinkley v. Brinkley (*supra*); Clayton v. Wardell (*supra*); Foster v. Hawley (8 *Hun*, 68); Taylor v. Taylor (1 *Lee*, 571); Rose v. Clark (*supra*); Caujolle v. Ferrie (*supra*); Collins v. Collins (80 *N. Y.*, 9).

A decree may be entered, adjudging that Emma L. Stanley, and not Eliza C. Stanley, was, at the death of this decedent, his lawful wife; that this petition be granted, and that the letters of administration heretofore issued to this respondent be revoked.