HARRIET E. CHRISTY and EDWIN B. CHRISTY, *appellants*, *vs.* PARIS G. CLARKE and others, *respondents*.

It is well settled that marriage may be proved by evidence of acts of recognition, matrimonial cohabitation, general reputation, and declarations of the parties.

When admissions in letters will furnish a sufficient ground for inferring the existence of marriage relations.

The circumstances that parties were known among their acquaintances as husband and wife; that the man's mother and brother knew of and recognized the relation, addressing the wife accordingly; and that the husband presented to his wife a locket, inscribed with his initials, " to his wife ;" *Held* abundant evidence to maintain the allegation of a marriage between the parties.

A married woman is a competent witness in behalf of her children to prove the marriage between herself and her husband.

A marriage thus proven by the direct evidence of one of the parties thereto, and by the various classes of proof above mentioned requires strong evidence to controvert it; especially when there is issue born of the parties between whom the marriage is alleged to have taken place.

A marriage ceremony, performed when the man is *in extremis*, helpless, surrounded by the wife and her friends, when he is apparently oblivious not only of a previous wife, but of his children also, can afford no presumption against a previous marriage.

Where the condition of a decedent is such as to render it necessary, in the judgment of those in whose favor a will is to be made, to have a medical consultation and opinion as to his sanity, full and strong proof of a disposing capacity should be required.

Where it appeared, on an application to the surrogate for probate of an alleged will, that the testator, while laboring under a fit of insanity, jumped out of a window, striking his head on the stones below, and so severely injuring himself as to cause paralysis from the neck down, and to result in death twelve days afterwards; and that during the whole of that period his only sustenance were liquids, and he was obliged to lie on his back, in one position; *Held* that these facts naturally led to the conclusion that his mind, on the tenth day, was materially impaired and weakened.

Where the injuries resulting in the death of a testator were caused by the insanity of the decedent; and paralysis existed during the whole of the period between the injuries and the death; the great weight of the medical testimony was against the existence of a sound disposing mind; the person in whose favor a will was alleged to have been made, by him deemed it necessary to have a medical examination as to sanity; the sons of the testator were excluded from the presence of their father while the will was in contemplation; and the testator while lying on his death bed and contem-

Christy *v.* Clarke.

plating the making of a will, in view of speedy dissolution, never once referred to his wife or children ; *Held,* that considering all these things, the question as to the validity of the alleged will should be submitted to a jury.

THIS is an appeal from a decree of the surrogate of the county of New York, dated June 2, 1865, admitting to probate a paper writing, alleged to be the last will and testament of Edwin P. Christy, deceased. The contestants and appellants are the widow of said Christy, deceased, and Edwin B. Christy, his only surviving son, and who is the only next of kin and heir at law. During the years 1859, 1860, 1861, and 1862, Edwin P. Christy was possessed of real and personal property, amounting in value to the sum of $200,000. During said years, he commenced to exhibit evidence of insanity ; which said insanity continued down to the time of his death, on the 21st day of May, 1862. Previous to the year 1835, the said Edwin P. Christy, then being poor, married Harriet E. Brooks, who was then residing in the city of Buffalo, in the state of New York, the marriage ceremony being perfomed by Justice McKnight. Mrs. Harriet E. Christy, at the time of her marriage with Edwin P. Christy, it appears by the evidence, was possessed of considerable property, which was taken by Mr. Christy to the city of New York, where he started in busines as an Ethiopian or minstrel performer. After said marriage with Harriet E. Brooks, there were four children born, named Edwin B., William A., Bianca V., and Harriet A. Christy. The two daughters, Bianca V. and Harriet A. Christy, died, and were interred in a grave yard in Buffalo, and a monument was erected by their parents, marking the place of their interment. Mr. Christy had a pew in a church at Buffalo ; his children, Edwin B. and William A. Christy, were baptized by the Rev. Mr. Ingersoll, which met with his approbation. While Mr. Christy was engaged in business in the city of New York, he kept his family residing at Buffalo, until his wife and children came to New York, in the year 1849. Mr. Christy, in the mean time, during the year 1848,

Christy *v.* Clarke.

fell in with, and kept a woman known as Mary Miller, at the house of one Eliza Pratt. Down to the time Mr. Christy commenced to keep the said Mary Miller, his favorite son William lived with him in the same house, until he was compelled to go away by some influence exercised by the said Mary Miller, and never again returned to his father's house. Mary Miller got possession of Mr. Christy's house as his tenant; and ever afterwards, until Mr. Christy's death, lived with him in a meretricious state. About the year 1849 or 1850, George N. Harrington, (the natural son of Harriet E. Brooks,) who was the principal attraction in Mr. Christy's business as a minstrel, separated from Mr. Christy, when Christy at once refused to support his wife Harriet, and sent an insulting note, alleging that his wife had turned up her nose at his mistress, Mary Miller. His son, Edwin B. Christy, having been sent to sea, (as also his son William,) returned about this time, and Mr. Christy was desirous that he should *horsewhip* his wife's natural son, which the son declined to do, and did not visit his father again. On William's return from sea, he never lived with his father again, who had in the mean time, removed from No. 96 Grand street to No. 78 East Eighteenth street, into a house he had purchased for his mistress, who then assumed to call herself the wife of Mr. Christy. Christy, prior to this time, in writing of this female to his children, called her "Aunt Mary." Mr. Christy finally abandoned his family altogether, and lived and cohabited with Mary Miller, who was also known by the name of " Maples," until the 9th day of May, 1862, when, having become so insane as to entirely lose his reason, as was claimed by the appellants, he precipitated himself from the second story rear window of the house in East Eighteenth street to the paved flagging beneath, inflicting severe injuries upon himself. Immediately upon the infliction of the injuries, he is alleged to have been removed to the basement of his house and to have talked intelligently. Although professor Budd, (a witness on the part of the pro-

ponents,) testifies that he was called to visit Christy imme-
diately after the occurrence of the injuries, and remained
with him for about an hour, and that Christy had not reacted
when he left, and that he was *entirely insensible ;* mutter-
ing something incoherently. Dr. Markoe testifies that when
he left, which was long after Dr. Budd had left, Christy
"did not indicate any symptoms of returning consciousness."
Mr. Christy was conveyed up stairs, and no person was al-
lowed to see him except Mary Miller, and the following per-
sons : Thomas E. Stewart, and Francis Chanfrau, witnesses
to the alleged will, Paris G. Clarke, the attorney who drew
the will, John J. Nathans and his wife, Peter Gilsey and his
wife, both of whom are executors and trustees named in
the alleged will, Patrick Cunningham a stable boy of the
executor Gilsey, a man by the name of Lowell, Lewis B.
Lent, McPherson Christy, Mr. E. P. Christy's brother, and,
as is alleged, one Snodgrass, who did not appear on the trial,
and the family physician Dr. Kissam, Dr. Markoe the phy-
sician who attended the late Henry Parish, Dr. Dash, Dr.
Kissam, and Lewis Marten a nurse. On the 17th day of
May, 1862, eight days after the injuries self-inflicted by Mr.
Christy, an alleged marriage took place between the pros-
trate man and Mary Miller Maples, at which officiated one
Rev. Mr. Adam, Peter Gilsey and wife, and John J. Nathans
and wife, standing up with the prostrate man, during the
alleged interesting ceremony. The clergyman marrying "a
*small man* with dark hair and whiskers moderately long ;"
while Edwin P. Christy was a tall man without either whis-
kers or hair on his head at the time of the said alleged mar-
riage. Dr. Dash, a witness for the proponents, testifies that
the hair on Christy's *head was trimmed close,* and that "the
hair had been shaved off around the wound" on his head in
order to dress it ; it was dressed with stitches, sticking plas-
ter, and compress of bandage. The clergyman who per-
formed the ceremony was a stranger to Mr. Christy, and the
parties concerned were called in by Mrs. Nathans, the wife

of one of the alleged executors. The clergyman was there but fifteen minutes. The marriage ceremony having been performed, the paper propounded as a will was drawn up, nine days after the injuries were received, and is claimed to have been executed by Christy, and witnessed by Thomas E. Stewart and Francis Chanfrau. At the time, while Mr. Christy was lying prostrate in bed, his own favorite servant was not allowed to see him ; his *son* and others, were excluded from the house, under many pretexts as to Mr. Christy's condition of health, by Mary Miller, who was at the basement window, to prevent people who would call from entering the house. By the alleged will a small annuity was given to Mr. Christy's mother, (since dead,) a life estate to Mary Miller, alias Maples, under the name of " Mary Maples Christy," reserving the right to the trustees or executors, or a majority of them, to sell the real estate, &c. Neither Harriet E. Christy, the wife, nor her child Edwin B. Christy, (William A. Christy having died shortly after his father's death,) were to receive one penny, but the whole estate was given to Mary Miller for life, with a liberal distribution to the executors, witnesses to the will, and others interested in sustaining the alleged will. So close was Mr. Christy kept in the custody of the parties already mentioned, that the heir at law, his son Edwin B. Christy, acting with the physician of the coroner, Dr. G. B. Bouton, Professor Rogers, and Mr. Blankman, were compelled to visit Greenwood Cemetery, and disenter the body to make a medical examination of the injuries sustained by Mr. Christy. All the physicians on the part of the contestants, (and Dr. Budd the proponent's witness,) after a careful examination of the bones injured, in the neck and spine, testify and sustain the witness Marten as to Mr. Christy's incapacity *to make a will, and the utter impossibility of his articulating a single word " coherently."* The evidence of the contestants, of the exclusion of Mr. Christy's son, as well as personal friends, from seeing him while in his distressed state, *stands uncontradicted on the record.*

---

---

*Benj. J. Blankman,* for the appellants.

*A. W. Bradford* and *P. G. Clarke,* for the respondents.

*By the Court,* GEO. G. BARNARD, P. J.    Three questions have been raised and argued :

1. Whether Harriet E. Christy was the lawful wife, and Edwin B. and William A. Christy the legitimate children and heirs at law of Edwin P. Christy, deceased, or not.

2. Whether a paper purporting to be the will of Edwin P. Christy was executed while he was of sound disposing mind, or not.

3. Whether said paper was procured to be executed by said Edwin P. Christy by fraud or undue influence, or not.

From the return of the surrogate, it does not appear that he considered or passed on the first question.    Having found the paper propounded as a will to have been duly executed, it became unnecessary for him to pass on the first question. The recital in the surrogate's decree, therefore, assumes and asserts that Harriet E. was the lawful wife of Edwin P. Christy, and is now his widow, and that William A. and Edwin B. are his legitimate children and heirs at law.    Although this recital is not a decision on the point, yet it shows that the surrogate, having concluded to admit the paper to probate, assumed, for the purposes of the litigation before him, that Harriet E. was the lawful wife of Edwin P. Christy, and is his widow ; and that William A. and Edwin B. are his legitimate children and heirs at law.

This court can not, therefore, consider the first question, with a view of reversing the surrogate's decree, as he has not passed on it.    Nor can this court, for the purpose of sustaining the decision below, examine the evidence to determine whether Harriet E. was the wife and is the widow, and William A. and Edwin B. the legitimate children and heirs at law of Edwin P. Christy ; for that would make this court, on appeal, a court of original jurisdiction, *pro tanto,* and to

Christy *v.* Clarke.

determine here for the first time, on printed testimony, a question of fact, which the parties have a right to have determined in the first instance by a tribunal that sees the witnesses and hears the oral proof.

This first question is, however, of considerable importance as bearing upon the other two, and aiding in their decision. In this view the court may examine it, for the purpose of seeing what probability there is of the appellants sustaining the affirmative of the proposition on a retrial. For if such probability be great, then for the purpose of considering the second and third propositions, the affirmative of the first proposition must on this appeal be deemed as a found fact; especially in view of the above mentioned action of the surrogate on this proposition.

It is well settled that marriage may be proved by evidence of acts of recognition, matrimonial cohabitation, general reputation and declarations of the parties. (*Rose* v. *Clark*, 8 *Paige*, 574. *Matter of Taylor*, 9 *id*. 611. *Clayton* v. *Wardell*, 5 *Barb*. 214. *S. C.* 4 *N. Y. Rep.* 230.)

In *Maxwell* v. *Chapman*, (8 *Barb*. 579,) it was held that the proven facts that the parties went from home avowedly to get married, returned, were received in society and lived together as husband and wife for several years, until the man died, were abundant to prove the existence of a marriage.

Under these principles, the evidence in favor of the marriage between Harriet and E. P. Christy is certainly very strong. The letters written by him to her are very strong. The first one read in evidence is dated August 15th, 1845, and is addressed to Mrs. E. P. Christy. There is nothing peculiar in this letter In his letter of October 30th, he says : " I presume you are lonesome, Harriet, but you are foolish to suppose that I will get weaned from my family." In his letter of January 16th, 1848, he says : " Do not be 'foolish Hall,' and worry yourself with your folly of imaginings." In his letter of January 27th, 1848, he says : " Has

Mr. Miller put that plate with my name on it in our pew in the church yet? If not, speak to him about it. I regret to say that I do not place that confidence in you which a person should who is connected by such ties as we are." Again: "My absence in my business from my family and yourself is no incentive to produce a want of affection; on the contrary, that very fact should endear them more to me; 'tis a natural result, and nature is my God." In his letter of March 5th, 1848, he says: "I sometimes think I will purchase a house and lot there for the family." In his letter of March 16th, 1848: "As regards my coming to Buffalo, I am not particularly anxious to see that city, unless it is on account of my family." Again: "Go to church, serve God, and take good care of your health." In his letter of March 26th, 1848, he says: "I am pleased to hear of Mr. Ingersoll's attention, also your invitation to the sewing society." In his letter of April 8th, 1848, he says: "I am glad to have you make the acquaintance of respectable persons, and I do not object to your visiting such. If you were young and beautiful, Harriet, or a lump of gold as you say, I would not be more anxious to see you than I am; but my business would go to the devil if I should leave it one day."

In his letter of May 8th, 1848, speaking of the illness of his son Byron, he says: "God knows I hope that his situation is not so bad as you think it is. Were he to be taken away from *us* now, it would be a loss we could never replace, and a source of inconsolable grief."

"You must not wrong yourself too much, Harriet. Remember, that let what happen, you will have the consolation of knowing that you have always done your duty by your children, and that no earthly want or care was required that was not in attendance." In his letter of May 8th, 1849, he says: "I am pleased to learn that Mr. Newhall has paid that note. You need not be afraid of my lending him any more. I have solemnly pledged myself to lend no person any money of an amount above $10 without the best kind of security."

Besides these extracts, the whole tenor of the letters is such as to lead to the conviction of the existence of marriage relations. They do not contain those strong expressions of love and affection which a young man would address to his be-throthed, nor which a man would address to a mistress of whom he was passionately enamored ; but they show that deep feeling of mutual interest in the affairs of each other which is never found outside of the recognized domestic relations. What does he mean by the expression, "united by such ties as we are ?". Does he mean the tie of a kept mistress ? Does he desire his kept mistress to mix in respectable society, and take a pew in church with a plate on it bearing his name ? Does he exhort his mistress to go to church and fear God ? What does he mean when he refers to his family and thinks of buying a house for them ? Is it bastard children and a lewd woman ? Who would express such anxiety about his lending money but a wife ? To whom but a wife would he, in order to quiet such anxiety, write that he had pledged himself not to loan ?

It is scarcely possible to draw from these letters any conclusion other than that of the existence of marriage relations.

But there is in addition to this considerable proof that they were known among their friends and acquaintances as husband and wife. His mother and one of his brothers knew of and recognized the relation. His mother, in her letter of September 28th, 1848, to Harriet winds up : "Adieu, your affectionate mother, R. CHRISTY."

One of his brothers, in his letter of April 19th, 1849, addresses Harriet thus : "Sister Harriet." Further, the witness Walker and the witness Campbell testify to admissions made by E. P. Christy, and facts connected therewith, so circumstantially as to leave but little question as to the honesty and accuracy of their testimony.

These various classes of proof, not to mention numerous other matters running through the testimony, such as the

presentation to Harriet of a locket inscribed E. P. C. to his wife, are clearly. abundant evidence, under the principles of law above laid down, to sustain the allegations of a marriage between Edwin P. Christy and Harriet.

But then we have further, the testimony of Harriet herself, who swears positively to the marriage ; and her story as to who the ceremony was performed by, the place where it took place, and the witnesses who were present, coincides substantially with the testimony of the witnesses Walker and Campbell. The testimony of Harriet was objected to as incompetent ; but it having been received, we must consider it. And moreover, it was clearly competent on behalf of her sons, under the principle of the law of *Chamberlain* v. *The People,* (23 *N. Y. Rep.* 85.)

A marriage thus proven by the direct evidence of one of the parties thereto, and by the various classes of proof above mentioned, requires strong evidence to controvert it ; especially when there is issue born of the parties between whom the marriage is alleged to have taken place.

In this case it is contended, that there are objections which destroy the force of the evidence above referred to, and that there are facts which show that such marriage could not have taken place. These objections and facts are :

1st. That in none of the letters to Harriet does Christy call her his wife, or style himself her husband.

2d. That Harriet, at the time of the alleged marriage with Christy, was married to one Harrington, who was then alive.

3d. That Harriet has stated that she was never married to Christy.

4th. That although Christy abandoned Harriet many years ago and lived with another woman, yet Harriet took no proceedings.

5th. That Christy has since married another woman.

The first objection is almost too trivial to notice. Persons have different ways of opening and closing their letters, and vary the form from time to time. Out of three letters in

evidence written by Christy to his son Byron, in none does he call him his son, and in but one does he style himself father. And the same remark is true of twenty letters writ-ten to William; yet there is no question that he was the father of these two boys.

With respect to the second objection, this rests upon proof of admissions and reputation, given by John Roberts, Nathan Harrington, Joseph Cooley, Lois Cooley and Catharine Rob-erts. John Roberts, husband of Catharine Roberts, swears that he understood by hearsay that George Harrington was married to Harriet; that he so heard from Edward McDan-iels; that he never heard any of the family speak on the subject. Nathan Harrington, a brother of George, swears on his direct examination that there was a general understand-ing in the family that George and Harriet were married, but he swears he never knew either of them to speak of their relations to each other. On his cross-examination he swears it was a mere supposition on his part that George was mar-ried to Harriet. He further says that he was present at George's death, and there was a woman then living with him whom he called his wife. Joseph Cooley swears, on his direct examination, that there was a reputation that George and Harriet lived together as man and wife. About this there is no dispute; it is conceded they so lived for a time. The question is what was the reputation as to their marriage. This witness also swears, on his direct examination, that Harriet said she had married a decent woman, but he (George) had made a whore of her. On his cross-examination he says : "Under the excitement she said he had brought her into a whore house, and made a whore of her, and I am *pretty pos-itive* she said he had married her and put her in a whore house; it is a good while ago; that is all there was of it; she went right out of the room, only staid there long enough to say that." Again he says : "I said yesterday that I had heard her say in his presence that he was her husband; but

he did not say she was his wife; he laughed and said nothing."

The evidence of these witnesses as to the reputation is clearly insufficient to establish that general reputation of marriage which is essential. As to its admission, it is a long time for one to remember, and every thing depends on the exact words used. It might well be that the words were: "he promised to marry me," which would be consistent with her statement that George had seduced her.

Catharine Roberts, a sister of Harriet and wife of the witness John Roberts, testifies that there was an understanding in the family that Harriet was married to George, and that Harriet's mother so understood it. She further says that all that Harriet ever said about her marriage was, that she was young and innocent when she was married to George Harrington. This witness had a difficulty with Harriet which has kept them separate for a great number of years. She is unable to remember the cause of this difficulty, although remembering the understanding and the conversation about marriage. This witness is but little to be relied on. Lois Cooley swears that she and Harriet were talking about marriage, and Harriet said she could not marry as long as she had a husband living, and mentioned his name as Harrington. The force of this testimony is very much weakened by her evidence on page 306 — although the matters thus detailed might not have much influence if the witness was swearing to a fact which seemed to be probably in her knowledge and of such a character as to be remembered by her, yet when she swears to that most suspicious of testimony, an oral admission, and that too an admission made in a casual conversation occurring so long ago, the facts detailed on page 306 have great force.

The testimony of these five witnesses, without considering the testimony of Harriet, is insufficient to establish the fact of a marriage between George and Harriet. In this connection it may not be amiss to advert to the singular attitude

Christy *v.* Clarke.

of the proponents' counsel insisting on this weak evidence as establishing a marriage between George and Harriet, while denying that the far stronger evidence in support of the marriage between Christy and Harriet establishes that marriage.

But whatever slight force there may be in the evidence of these witnesses, it is dissipated by the evidence of Harriet, who swears distinctly that George seduced her, and that she was never married to him. This is a fact about which she could not be mistaken, and which she must have remembered. She also testifies that she never told any one she was married to George; that she never told any person that she was never married to Christy; and never told Lois Cooley that she could not marry Christy because she was married to Harrington.

As to the third objection, this depends on the testimony of Lois Cooley and John A. Simonson. So far as the testimony of Lois Cooley is concerned, that and the evidence of Harriet in relation to it, has been commented on in considering the second objection. John A. Simonson swears that either in Allen, or Orchard, or Ludlow street, in 1853 or 1854, in his conversation with her, she certainly told him she was not married to Christy, It is clear that from 1852 up to March, 1856, Harriet lived in the Ninth avenue. The witness has evidently made a serious mistake as to time. Whether he is mistaken as to the conversation also, we have no means of determining, except from the fact that Harriet flatly contradicts him.

With reference to the fourth objection, there can be no doubt that when a party sleeps for a long time upon his rights, or injuries, he prejudices his claim and casts suspicion on it; but the amount of suspicion depends on all the surrounding circumstances. All the evidence tends to show that Christy was an irritable and violent man, and she may have feared personal violence to herself and children at his hands; or may have feared that any action on her part would so still further incense Christy as to interfere with the prospects of

her children, by rendering the return of the father's natural affections more improbable and uncertain. A child's welfare, and solicitude for its future welfare, are always uppermost in the thoughts of a mother, and furnish the mainspring to her actions. Or, again, she may have been waiting with patient resignation for Christy to tire of his new love, and to return to the old affection exhibited in his letters to herself and her sons. If she had taken any proceedings, what could she have obtained? A mere support for herself, and run the chance of ruining the prospects of her children, and putting up an insuperable bar against a reconciliation. The forbearance of a woman and a mother under these circumstances— she, doubtless, unaware that such forbearance would have any prejudicial effect—should not be viewed too harshly.

With regard to the fifth objection. This is of a negative character. It is that if Christy was married to Harriet, he would not have married Mary, as that would involve him in the crime of bigamy. To sustain this objection, the marriage with Mary must first be shown. The evidence to sustain this is of the same character as that to sustain the marriage with Harriet. (The death bed scene is not now referred to.) It is strong, but not stronger than that adduced on behalf of Harriet. It is true the letters to Mary are signed "your loving husband," and he speaks of Mary in them as his wife; but their general tenor and internal evidence is not so strong as those to Harriet, and one of those to Harriet is addressed, Mrs. E. P. Christy.

It is true he introduced Mary as his wife; so he did Harriet. It is true that, in a casual and seemingly joking way, he told Eliza Pratt that he and Mary had got married while they were off traveling; he also told Walker and Campbell, in a much more serious way, substantially, that he had married Harriet.

If the evidence adduced to prove the marriage between Christy and Mary is sufficient, it is difficult to perceive why the evidence adduced to establish the marriage between him and

Christy *v.* Clarke.

Harriet is not also sufficient. And as the classes of evidence to support the one are the same as the classes to support the other, there can be no preference in favor of the last one. But then there are, as in the case of Harriet, certain matters casting suspicion on this marriage of Mary. Why, if she were married at Ithaca, did she have a marriage ceremony performed when Christy was *in extremis?* Was it because she anticipated trouble from Harriet? She knew all about Harriet when she married, as alleged, at Ithaca. Why did she not then anticipate trouble and guard against it?

Again; if she were Christy's wife, and possessed wifely feelings, why did she, while excluding Christy's sons from their father's presence for fear of exciting him, impose on him the excitement of a marriage ceremony?

The presumptions spoken of in 4th New York Reports against a former marriage, proved by reputation, in favor of a subsequent marriage proved by positive direct evidence, has no application to this case, for here there is no direct evidence of the second marriage, (excluding the death bed ceremony,) and the testimony of the minister who performed the marriage ceremony *in extremis,* leaves great doubt as to whether it was ever performed before; besides, the acquaintance which it is claimed ripened into the marriage with Mary, confessedly commenced in a meretricious intercourse.

The death bed ceremony (conceding it to have taken place, which is disputed,) can hardly be expected to have much influence on the question of the marriage with Harriet. It was performed when the man was *in extremis,* helpless, surrounded by Mary and her friends; when he was apparently oblivious not only of Harriet, but of his children also. A marriage under these circumstances can afford no presumption against a previous marriage.

A few words on this marriage ceremony performed by the minister. The minister says Christy said it had long been his wish and determination to have this marriage ceremony performed, but that something or other had always occurred

to prevent it. Rather a singular statement for Christy to make if, as Eliza Pratt swears, he had married Mary at Ithaca years before.

Taking the whole of the evidence on this point together, it is evident that there is great probability of a jury finding that Christy was married to Harriet, and therefore it must be assumed (as the surrogate seems to have assumed) in considering the second and third questions, that Christy was lawfully married to Harriet, and that William and Byron were his lawful sons and heirs at law.

If the surrogate had decided that there was no marriage between Christy and Harriet, I think such decision would have been against the weight of evidence ; at all events, that the testimony is of such character as to render it expedient to have a verdict of a jury on it.

Now turning attention to the second and third propositions, we find the following legal principles applicable. In *Marsh* v. *Tyrrell*, (2 *Hagg.* 122,) Sir John Nicoll said : "It is a great but not uncommon error to suppose, that because a person can understand a question put to him, and can give a rational answer to such question, he is of perfect sound mind, and is capable of making a will for any purpose whatever ; whereas the rule of law, and it is the rule of common sense, is far otherwise ; the competency of the mind must be judged of by the nature of the act to be done, from a consideration of all the circumstances of the case."

In *Harwood* v. *Baker*, (3 *Moore's Priv. C. R.* 282,) Erskine, J. says : "But their lordships are of opinion that in order to constitute a sound disposing mind, a testator must not only be able to understand that he is by his will giving the whole of his property to one object of his regard, but that he must have also capacity to comprehend the extent of his property, and the nature of the claims of others, whom, by his will, he is excluding from all participation in that property ;" "that the protection of the law is in no cases more needed than it is in those where the mind has become too much

enfeebled to comprehend more objects than one, and most especially when that one object may be so forced upon the attention of the invalid as to shut out all others that might require consideration."

In *Den* v. *Johnson*, (2 *Southard*, 454,) the chief justice said, in charging the jury, "that a disposing mind and memory is a mind and memory which has the capacity of recollecting, discerning, and feeling the relations, connections, and obligations of family and blood; that though it has been sometimes said, as had been stated from the books, that if one could correctly tell his name, say the day of the week, or even ask for food, it is a sufficient evidence of a disposing mind; yet such sayings, though they show that wills are not lightly to be set aside on suggestions of incapacity, can and ought to have but little weight with rational men, investigating the truth upon their oaths; that if upon the whole they should be of opinion that the mental powers of the testatrix were so far enfeebled and broken as that she could not make a discreet disposition of her affairs herself, and the will in question was devised by other persons, and only assented to by her, upon being asked, without the power of understanding it, then they ought to find against the will."

There are numerous other authorities cited in *Delafield* v. *Parish*, (25 *N. Y. Rep.* 23.)

In the case at bar, it appears that Mr. Christy, while laboring under a fit of insanity, jumped out of a window, striking his head on the stones below, and so severely injuring himself as to cause paralysis from the neck down, and to result in death twelve days afterwards. During the whole of this twelve days his only sustenance were liquids, and he was obliged to lie on his back in one position. This statement naturally leads to the conclusion that his mind on the tenth day was materially impaired and weakened. And I understand the medical testimony, although the doctors widely differ in many things, sustains the natural conclusion. The great preponderance of the medical testimony is that Mr.

Christy, on the ninth day, although possessing conciousness, could have had but little memory, and less reasoning faculty.

Does the evidence of what Christy actually did and said, after the injuries, controvert the medical opinion? The witnesses who have testified on this subject, (other than the subscribing witnesses and one of the executors to the alleged will,) are Thomas Clarkson, Lent, Lowell, Morgan, Cunningham, McPherson Christy and Mrs. Teller. The matters testified to by these witnesses all come within the principle laid down by Sir John Nicoll. They are either rational answers made to some simple questions, or they are requests for nourishment, or they are short remarks on his memory being suddenly aroused, by the sight of some familiar person or object, or by some familiar sound. This all shows, it is true, some conciousness, but not necessarily, as Doctor Rogers well expresses it, sane conciousness. Nor do they show a sound disposing mind, under the principles laid down by Sir John Nicoll.

The testimony of the doctors who attended him, and their examination as to his sanity, is liable to the same criticism. Christy gave rational answers to questions put. What those questions were, we are not informed; nor can we tell what degree of ratiocination the answers involved.

Here it is proper to remark that where the condition of a decedent is such as to render it necessary in the judgment of those in whose favor a will is to be made, to have a medical consultation and opinion as to his sanity, full and strong proof of a disposing capacity should be required.

Thus far the evidence as against Mr. Christy's having a disposing mind very strongly preponderates.

The only remaining evidence to be considered in this connection, is the testimony given by one of the executors and the two subscribing witnesses. These witnesses swear to a state of facts which, if standing alone, would if their statements are to be received without many grains of allowance, be in one aspect of the case sufficient to establish the com-

petency of the testator. They swear to a prolonged conversation and an amount of mental exertion on the part of Christy, which, in view of the other testimony, is, to say the least, extraordinary. It may well be that Christy made answer to questions put to him, and acceded to suggestions made to him; but that he possessed sufficient reasoning faculty to himself originate an idea respecting the will, is certainly not to be looked for under the circumstances of this case. One of the witnesses is one of the executors, a lawyer, and the chief party in pressing the probate of the will; another is one of the subscribing witnesses, a lawyer and attorney for one of the executors; the third is the other subscribing witness. It will be perceived that all these witnesses have a great interest in sustaining the will; the layman to avoid the imputation of having witnessed a will made by an incompetent person, and the two lawyers, in addition to this, the further interest in establishing the cause of their client.

The witnesses, testifying under the bias of this interest, would naturally give to their testimony a shade and coloring in support of that bias, and this even innocently. Under the influence of this bias, one of the witnesses swears that Christy held up the will in his hands, looked at it and smiled, while it is incontestibly proven that by reason of paralysis Christy was unable to move his hands. Another of the witnesses swears that Christy, in order to show how much better he was, smiled and moved his head from side to side, making a remark at the same time; while all the testimony shows that such movement of the head, if possible without producing death, would produce great pain.

If, under the influence of bias, the witnesses would innocently swear to these matters, it is not unreasonable to conclude, under the whole testimony in the case, that they have also just as innocently put in Christy's mouth language which emanated from others, and ascribed to him a power of ratiocination which he did not possess.

In my view, the evidence of these witnesses is not, under all the circumstances of the case, sufficient to carry the paper in question to probate, without at least a verdict of a jury.

Under another aspect, the testimony of these witnesses, even supposing that it correctly details the circumstances without any coloring or deviation from the exact facts, and is not contradicted in the slightest degree, would not, under the authorities cited in this opinion, be sufficient to carry this paper to probate. During the whole of Christy's illness, and while the will was in course of preparation, no allusion is made either by him or any person to his wife Harriet, (the term, wife Harriet, is used for the reasons hereafter mentioned,) or his sons, showing as hereafter stated, that he had not the memory of who were the proper and natural objects of his bounty, required by the above cited authorities.

Further than this ; his sons were not only not invited to attend, but were excluded, and this too while comparative strangers, as Lowell, Snodgrass and Morgan were admitted to his presence.

Judge Denio, in his opinion in the *Hopper* case, says : " I think, after it was seen that he was dying from an accidental injury, it was the duty, of one standing in such a relation to him as Mr. Shaffer did, to endeavor at least to put him in communication with those who had a natural right to protect him."

Assuming, (as has been frequently said we must on this branch of the case,) that Harriet was lawfully married to Christy, and that William and Byron were his legitimate sons and heirs at law, Mary stood in such position as to render it her duty to invite his sons to attend, rather than to exclude them.

In conclusion. Considering the insanity which led to the injuries resulting in death twelve days after they occurred ; also the paralysis existing during the whole of that time ; also the great weight of the medical testimony against the existence of a sound disposing mind ; also the necessity deemed to exist by the persons in whose favor the will was

made for a medical examination as to sanity; also the exclu-sion of the sons from the presence of their father while the will was in contemplation; also that the deceased while ly-ing on his death bed, and contemplating making a will, in view of speedy dissolution, never once referred to his wife Harriet (the term wife Harriet is here used, because the surrogate so assumed, and because in the fore part of this opinion it is held that that fact must be examined in disposing of this branch of the case,) or to his sons to whom he, lying on that death bed, must have referred if in a sound disposing mind, since in that event his memory must have passed his whole life in review, and chastened by the hand of God, would have reflected on the injuries he had done them, and have endea-vored to make some reparation, or if still stubborn in spirit, would from his very nature have made some remark indica-tive of his anger towards them; considering all these things, the question as to the validity of this alleged will should at least be submitted to a jury.

Decree of surrogate reversed, with costs of appeal to ap-pellant to abide the event, and issues directed to be tried by jury. Issues to be settled on notice.

[NEW YORK GENERAL TERM, January 2, 1866. *Geo. G. Barnard, Ingraham* and *Clerke,* Justices.]