In the Matter of the Revocation of Letters of Administration of the Goods, Chattels and Credits of JOHN FINDLAY, Deceased.

ALFRED BROOKS, Appellant; WILLIAM FINDLAY and Another, as Administrators, etc., of JOHN FINDLAY, Deceased, Respondents.

Second Department, October 7, 1929.

*Christian S. Lorentzen,* for the appellant.

*James N. Gehrig,* for the respondents.

CARSWELL, J.  The respondent William Findlay applied for letters of administration of one John Findlay, deceased.  He asked that Jeremiah Wood be made a joint administrator.  William Findlay claimed to be the brother of John Findlay, deceased, and Jeremiah Wood was joined because he had become acquainted with the matter before William Findlay appeared.  Jeremiah Wood had been asked by one Annie Smith to look into a claim of hers for alleged services as housekeeper, rendered to the deceased John Findlay.  Letters of administration issued to William Findlay and Jeremiah Wood on January 14, 1927.

After a considerable lapse of time the appellant, Alfred Brooks, moved to revoke those letters and have the letters of administration issue to him.  The ground of his application respecting Wood was that Wood was disqualified by reason of an adverse interest,

in that Wood had indicated that he represented or intended to represent Annie Smith in connection with her alleged claim against the deceased. The ground of the appellant's application with respect to William Findlay was that William Findlay was not a legitimate brother of the deceased, John Findlay; that he was an illegitimate son of one Ann Aldridge, who was the mother of John Findlay, deceased, by one Henry Brooks, that John Findlay's real name was Albert Brooks, and that he was a legitimate brother of the appellant, Alfred Brooks, they both having as a common father and mother Henry Brooks and Ann Aldridge, which two persons had been joined in lawful wedlock at the time of the birth of the deceased and the appellant.

The surrogate denied the appellant's application to revoke the letters of administration of William Findlay and Jeremiah Wood, and from the decree entered thereon the appellant, Alfred Brooks, appeals.

The surrogate found that Jeremiah Wood had no adverse interest in that Annie Smith never did present a claim against the estate and that Jeremiah Wood had merely listened to her assertion of a claim at a time when it appeared as though she would be entitled to the property involved as the sole heir in her capacity as niece of the deceased wife of the decedent, John Findlay. When William Findlay appeared upon the scene and claimed to be the brother of John Findlay, deceased, Jeremiah Wood joined with him and Annie Smith dropped out of the situation, and the letters of administration referred to issued accordingly. The surrogate also decided that William Findlay was the legitimate son of the marriage of Henry Brooks and Ann Aldridge and, therefore, was a full blood brother of the deceased, John Findlay, who was a son of the same marriage, born Albert Brooks.

This finding of the surrogate adopted one theory advanced on behalf of William Findlay and rejected the claim of the appellant, Alfred Brooks, that William Findlay was an illegitimate son of Ann Aldridge by one James Findlay, with whom it is claimed she ran away from her husband, Henry Brooks, at a time when said Henry Brooks was living in England.

The surrogate rejected a second theory advanced on behalf of the respondent William Findlay, that he, William Findlay, was the legitimate son of James Findlay and Ann Aldridge and, therefore, a brother of the half blood of the decedent, John Findlay (Albert Brooks) and the petitioner, appellant, Alfred Brooks. This claim thus rejected advanced the theory that the record herein, by reason of certain presumptions and by reason of a lack of proof rebutting them, would sustain a holding that Ann Aldridge was

the wife by a valid common-law marriage of James Findlay and that, therefore, their son, the respondent William Findlay, would be a legitimate half brother of the deceased, John Findlay (Albert Brooks), the son of Henry Brooks and Ann Aldridge by a prior irregular union.

The record herein amply sustains the finding of the surrogate in accepting the theory that the respondent William Findlay is the legitimate son of Henry Brooks and Ann Aldridge. It may be that the record would also sustain a finding in favor of William Findlay on the theory that has been rejected by the surrogate, although advanced on his behalf, that he is the legitimate half brother of the deceased, John Findlay. This latter question has become academic since the respondent William Findlay has acquiesced in the determination of the surrogate which holds him to be a brother of the full blood and because William Findlay's right to letters of administration would not be affected by whether they issue to him upon the basis of his being a brother of the full blood or of the half blood of the decedent, John Findlay.

The consideration of the questions involved herein concerns what presumptions arise under certain given circumstances; what strength those presumptions have under those circumstances; upon whom rests the burden of seeking to overthrow those presumptions, and a further query as to whether this record contains evidence effectively overthrowing the presumptions which arise herein. To pass upon these questions a summary of the evidence which the surrogate was free to accept upon this record will suffice.

On August 15, 1852, Henry Brooks married Ann Aldridge in England. In 1852 Arthur Brooks was born to them and he predeceased without issue every one involved herein. On March 10, 1855, Albert Brooks, subsequently known as John Findlay, the deceased herein, was born to the same couple in England. He came to the United States in 1874 and died in Nassau county on April 2, 1926, under the name of John Findlay, leaving no issue. His wife predeceased him.

Alfred Brooks, the appellant herein, was born to the same couple in England on January 21, 1859. Alfred Brooks visited the United States in 1881 or 1882 and found his mother, Ann Aldridge, in Detroit, Mich., living with one James Findlay, with a household consisting of these two just named; Albert Brooks, then known as John Findlay, the decedent; and, in addition, William, Walter and James Percy Findlay. Alfred Brooks lived with this group for a while and then returned to England. While

a resident of England he instituted this proceeding which is under review.

In 1864 Ann Aldridge ceased to live with Henry Brooks in England and her whereabouts were unknown until 1881 when the record reveals that the appellant, Alfred Brooks, visited her in Detroit, Mich.

In 1865 Walter (Findlay), who was in the Detroit household in 1881, was born to Ann Aldridge. On September 9, 1875, William Findlay, the respondent herein, was born to Ann Aldridge in England. Subsequent to 1881 James Percy Findlay was born in the United States to Ann Aldridge.

In 1900 Ann Aldridge, the mother of all of the foregoing children, previously known under the name of Brooks, but later known under the name of Findlay, died in Detroit, Mich.

In 1903 James Findlay, who lived with Ann Aldridge in Detroit subsequent to 1881 as her husband, died. In 1906 Henry Brooks, the first man who, this record shows, lived with Ann Aldridge or was married to her, died in England.

From the foregoing it appears that in January, 1927, the only persons surviving in the enumerated group were the petitioner, appellant, Alfred Brooks, living in England; William Findlay, the respondent, living in Detroit, Mich., and Annie Smith, in Nassau county, in the household of the decedent John Findlay (Albert Brooks) as the niece of his deceased wife.

The effect of the holding which has been had herein is to establish William Findlay's right to be administrator of the estate of John Findlay and to subject it to an equal division between William Findlay, the respondent, and Alfred Brooks, the appellant. If the second theory advanced on behalf of William Findlay had been adopted, that he was the legitimate brother of the deceased and that the deceased was an illegitimate child of Henry Brooks and Ann Aldridge, then the respondent William Findlay would take the entire estate. He foregoes, however, by failing to appeal, the more favorable theory so far as his property rights are concerned. Alfred Brooks seeks the entire estate on the theory that he is the full blood legitimate brother of the decedent, John Findlay (Albert Brooks) and that William Findlay is an illegitimate brother of the deceased, and by reason of that fact not entitled to share in the estate.

We need spend little time on the assertion that Jeremiah Wood may not properly be an administrator herein. It appears in this record that Wood does not in fact represent Annie Smith and has not presented any claim against the estate for her. Moreover, as coadministrator, William Findlay does not object to him, and if

the decree is correct as to William Findlay, the appellant's contentions with respect to Wood are of no practical importance.

The vital question in the case is as to the effect to be given to the foregoing evidence with respect to such presumptions as may arise. On the theory which the surrogate had adopted, the respondent William Findlay asserts that when his legitimacy is attacked the burden is upon the person attacking it to prove that his mother, Ann Aldridge, and her lawful husband by the marriage of August 15, 1852, did not have access to each other prior to the birth of the respondent William Findlay and at a time in relation to the year of his birth, 1875, when conception would normally occur. The appellant, Alfred Brooks, contends that no presumption arises of which William Findlay may have the benefit, because such a presumption involves the invoking of aid through Ann Aldridge, and that she, as he claims, being a guilty spouse, having left her husband, is not so situated as to have any presumption arise in her favor, or in favor of any one claiming through her. The appellant asserts that there is no presumption that he, the appellant, has to overthrow by reason of a burden being cast upon him to establish the illegitimacy of William Findlay, the respondent. He further asserts that the evidence adduced does overthrow such a presumption if it did in fact arise.

I concur in the view advanced by the respondent William Findlay. The presumption of legitimacy is one of the strongest known to our law, as well as to the English law (*Hynes* v. *McDermott*, 91 N. Y. 451), and the degree of proof needed to overthrow it is very exacting, as has been indicated in the leading New York case (*Caujolle* v. *Ferrié*, 23 N. Y. 90), where the presumption was invoked to sustain a legitimacy under facts much more gross than are the facts in the case at bar. The rule extracted from that case by GAYNOR, J., in *Mayer* v. *Davis* (122 App. Div. 393) is there stated: " The burden was on the respondents to show incontrovertibly — (by ' irrefragable proof,' *Caujolle* v. *Ferrié*, 23 N. Y. p. 108), *i. e.*, so clearly and certainly as not to admit of denial, dispute or controversy (see ' Irrefragable,' Century Dictionary) — that such access did not take place, and this they did not do. It would be hazardous to say there was no access."

The same question was considered in *Matter of Barthel* (111 Misc. 727; affd., 192 App. Div. 926, without opinion). In that case the child challenged was the offspring of a woman who lived with her husband in a house in which a male boarder also resided. It was claimed the male boarder was the father and the question was decided upon the basis of the presumption of legitimacy and the

effect thereon of the failure of proof of non-access of the lawful husband to the wife at or immediately prior to the time of conception. It was there held that the presumption of legitimacy carried the case for the child as against such evidence as was adduced. The same question was considered in the case of *Coler* v. *McTighe* (213 App. Div. 831), where this court unanimously stated: " The marriage of the complaining witness, prior to her alleged relations with the defendant, was competently established by her own testimony. (*Christy* v. *Clarke*, 45 Barb. 529.) Once established, the marital relation is presumed to continue, and a child born during its continuance is presumed to be legitimate, the presumption continuing until satisfactory proof to the contrary is shown. (*Caujolle* v. *Ferrié*, 23 N. Y. 90.) In the present case the presumption of legitimacy was strengthened by the statement, contained in the baptismal certificate, that the complainant's husband was the child's father, and by the complainant's testimony that she gave the name of her husband as its father. These presumptions of continuing marriage and consequent legitimacy were not overcome by the unsatisfactory evidence of divorce. And if the marriage status existed at the time of the complainant's alleged relations with the defendant, her testimony of non-access by the husband is also unsatisfactory. Where the legitimacy of a child is involved, non-access by the husband must be established by ' irrefragable proof.' (*Mayer* v. *Davis*, 122 App. Div. 393.) "

The claim of the appellant that no presumption may be invoked because of a charge that Ann Aldridge was a guilty spouse who had left her husband in 1864 is an assumption that has no proof to support it so far as the claim of alleged guilt is concerned. The fact that she left her husband is established, but there is no proof as to why she left or of circumstances indicating that her leaving was not justified. There is no presumption that her leaving was unjustified. Therefore, this element does not bar the arising of a presumption by way of aiding the presumption of legitimacy of the respondent William Findlay.

The undisputed facts show that she left Henry Brooks in 1864, but the record is silent as to whom she lived with from 1864 to 1881 and indeed is silent as to where she lived during that period, or at least for the most part of it. There is evidence that she went away with a man named James Findlay, but there is no evidence that she lived with him prior to 1881, when she was found in Detroit by the son, the appellant, Alfred Brooks, living with James Findlay together with the decedent and other children. It is undisputed in this case that the respondent William Findlay was born in England of Ann Aldridge in 1875, a year after the

decedent, John Findlay (Albert Brooks), went to America. There is proof from Stephen Brooks, Henry Brooks' brother, that Ann Aldridge returned from the United States on one occasion after she left England, but he does not know when she left England. He does not know what date she returned, whether before or after 1881.

We, therefore, have the undisputed proof of a validly consummated marriage between Henry Brooks and Ann Aldridge in 1852; of Ann Aldridge leaving Henry Brooks in 1864 and having a child, the respondent William Findlay, in England in 1875, which is before there is any proof in the record of her living with James Findlay, which proof first appears as of 1881 with respect to Detroit, Mich. The record contains proof that Henry Brooks continued to live in England, to wit, in London, until his death in 1906, having never left it. Therefore, there is *prima facie* proof that Henry Brooks was not without access to Ann Aldridge in England up to and including 1875, when respondent William Findlay was born. There also appears to have been another child, Walter, born about 1865, but he has since died and is not involved herein.

The burden was upon the petitioner, appellant, Alfred Brooks, to establish the non-access of Henry Brooks to Ann Aldridge up to and including 1875. There is no evidence of non-access; therefore, the standard of " irrefragable proof " required to overthrow the presumption has not been met, and hence the presumption of the legitimacy of William Findlay, born in England in 1875 as the child of Henry Brooks and Ann Aldridge, stands unimpaired by any proof. The leaving of Henry Brooks by Ann Aldridge in 1864 is not wholly inconsistent with Henry Brooks having access to her at a time just prior to 1875 and thus becoming the father of William Findlay. There is no proof in the record that James Findlay, the other man, lived with Ann Aldridge in England between 1864 and 1881, and even if he did live with her, and we may not indulge in suspicion in lieu of proof in this regard, that would not be inconsistent with Henry Brooks' access to his wife Ann Aldridge just prior to 1875, since they were both in England, apparently in London, during that period. This view necessarily should obtain in view of the absence of proof that James Findlay in fact lived with Ann Aldridge in England and in view of the absence of proof that Henry Brooks did not have access to her in England since, though she was available for such access.

The next phase to be disposed of is whether the presumption of legitimacy still continues unimpaired because of the failure of the appellant, Alfred Brooks, to adduce proof of non-access on the

part of Henry Brooks despite testimony adduced by the appellant from the mouth of the respondent William Findlay. William Findlay testified that the man with whom his mother lived, James Findlay, was his, the witness William Findlay's, father and that he had been informed by that man, James Findlay, and the others in the household, to wit, the decedent, John Findlay (Albert Brooks), and the mother, Ann Aldridge, that he, the witness William Findlay, was a son of James Findlay and a brother of John Findlay (Albert Brooks), the decedent, as well as of the individual, Alfred, in England, the petitioner herein. No objections were taken to this testimony, which was hearsay and was not adduced in compliance with the exception to hearsay which relates to proof of pedigree. The preliminary question of relationship was not established by evidence other than that of the declarations themselves as is required by *Young* v. *Shulenberg* (165 N. Y. 385, 388). This preliminary element requires but slight evidence, but it must be independently established and there is no independent establishing of it apart from the declaration quoted from the witness William Findlay of the relationship of James Findlay (the other man) to William Findlay or to any one else for that matter. The pedigree rule requires, as essentials to that exception to the exclusion of hearsay, that the declarant must be dead and that the relationship between the declarant and the person whose pedigree is in question has been independently established (and showing a connection by blood or marriage), and the declaration must have been made before the litigation arose. Only two of these three prerequisites were complied with: (1) That the declarant was dead (*Eisenlord* v. *Clum*, 126 N. Y. 552, 563), and (2) that the declaration was made before the litigation. The third, that of relationship, was not established (*Young* v. *Shulenberg, supra*), but the evidence having been admitted without objection, it must be considered. Its weight is, however, to be determined in the light of whether or not the prerequisites to its admissibility were complied with as this affects the probative value of the declaration.

The picture presented of Ann Aldridge living with James Findlay in Detroit with all these children is one that would account for nothing being said about Henry Brooks, or anything that would arouse thoughts respecting him that would reflect upon the respectable character of the household. It is natural, therefore, that the respondent William Findlay would be given to understand, if not by express words, by conduct generally of those in the household, that he was the son of James Findlay and Ann Aldridge and the brother of John Findlay (Albert Brooks), the decedent, and of any

of the other boys in the household at that time. But his being given to so understand, and his afterwards declaring his understanding, as well as the means by which he arrived at it, in the evidence in this case, does not establish as a fact whether or not James Findlay was his (William's) father. The entire case, considered in connection with the want of proof of non-access of Henry Brooks, presumptively establishes as a fact that William Findlay was the son of Henry Brooks and Ann Aldridge, and that fact, thus established by presumption unimpaired by any other evidence, remains established even in the face of the testimony of William Findlay as to what he " understood " was his relationship to this man James Findlay who lived with his mother in Detroit, Mich., in 1881, and thereafter.

I concur in what the learned surrogate stated on this point: " The petitioner asserts that it is the only question involved and bases his assertion upon the fact that William Findlay has testified that he was the son of James Findlay, and that he is bound by such testimony. In view of the strong presumption of legitimacy of a child born during the continuance of lawful wedlock, I do not feel that the court is bound by such testimony. Obviously William Findlay could not personally know who his father was. Obviously his testimony is based upon the fact that he was brought up by James Findlay and Ann Findlay upon the understanding that they were lawfully married and that he was their legitimate son. His testimony as to his parentage is of course hearsay and can be based only upon what his mother told him. If the mother's testimony were offered for the purpose of establishing him to be illegitimate it would not be competent, and could not be considered because it is against public policy to allow a wife to bastardize her own child. (*Matter of Barthel*, 111 Misc. 727; affd., 192 App. Div. 926.) "

The foregoing is in accord with similar rulings in other cases. In *Tracy* v. *Frey* (95 App. Div. 579) the question of the legitimacy of a girl was involved. The girl herself believed that she was illegitimate by reason of communications to her by one Evans and of other communications. It appeared that she had stated in a letter that she was the adopted daughter of Evans, while she claimed in this case that Evans was her father. There was then added to this situation a declaration of the alleged father that he was not married at the time the child was born. In the face of all this the question of the legitimacy was determined in her favor because of the force given to the presumption of legitimacy and because her declarations of belief did not establish the fact of her illegitimacy but merely established her belief with regard to that

because of communications of that character made to her, which declarations and communications fell before the weight of the presumption of legitimacy. It was held that her declarations did not work any estoppel upon her or in any wise bind her, the court saying (p. 592): " Her belief, if she had one upon the subject, did not work an estoppel upon her, nor did it in anywise bind her, and if she was led to believe by communication from David Evans or from other sources that she was illegitimate it would not bind her as to the fact in the slightest manner." And again (at p. 594): " This letter was written under date of February 26, 1873, over ten years after the death of Hannah Maria, and his statement that he was then unmarried and that the daughter was all the family he had was true. To this letter Kate Maria Williams attached a postscript, in which she recites herself as the adopted daughter of Evans, and, therefore, claimed Thomas as her uncle. Mrs. Williams was interrogated respecting the circumstances attending the writing of this letter and the reason why she was named as his adopted daughter. Upon objection of the plaintiff the explanation was excluded. It cannot, therefore, be claimed that no explanation was offered of this letter. So far as he states that she was his adopted daughter, it is a declaration made by him and is entitled to some probative force, but it is the same species of evidence as that to which we have already adverted. The statement is not binding upon and is of slight probative force against Mrs. Williams. She was not bound by any of these statements made to her, and information conveyed by David Evans or from other sources do not have the slightest effect upon her legal status, nor bind her in any way, nor establish her illegitimacy. Information conveyed to her that she was illegitimate would not make her so if she were in fact a legitimate child. What her father informed her during that period could have no more force in determination of the fact than would his other declarations to the same effect, even though she believed the statements. We might conclude from all of this testimony, standing alone, that it would be sufficient upon which to base a finding of illegitimacy, and we might feel constrained to support this judgment upon the finding which has been made, although it is not nearly as strong in probative force as was the case considered in *Caujolle* v. *Ferrié* (*supra*) and *Hynes* v. *McDermott* (*supra*), where illegitimacy was rejected, and it seems to fall short of being incontestable and undeniable."

The foregoing case has been frequently cited. The appellant insists that the testimony of the respondent William Findlay with respect to what he understood and what had been declared to him

by James Findlay and others in the household was binding upon him to a degree that would overthrow the presumption of legitimacy invoked on his behalf. The authority relied upon by the appellant is *Reed* v. *McCord* (160 N. Y. 330). That was a negligence case where an employer made statements which involved an admission of liability with respect to an accident of which he had no personal knowledge. That case is not controlling in the situation herein because the very facts in each of the situations distinguish it from the case at bar and also make the case at bar come within the language and reasoning of *Reed* v. *McCord* (*supra*). In that case the employer had an opportunity to investigate and in fact did investigate into the details of the accident and was in a position to make an admission of liability and of negligence on the part of those for whom he was responsible. He was in a position to pass judgment upon the value of the information he acquired as the result of his investigation. In the case at bar William Findlay had no reason to make an investigation and had no opportunity to pass upon the value of the result of such an investigation if one had been made. He was living in a household where everybody treated the others as related to each other in a legitimate way. There were no outside means or records available to check up, and, therefore, his declarations do not have the binding force of the declaration of an employer who had in fact made an investigation before he made an admission of negligent conduct on the part of those for whom he was responsible. Certainly in either case, and particularly in the case at bar, one would have the right to mitigate or moderate the effect of the admission by showing the facts upon which the admission was based by way of establishing that the admission should have no probative force.

In *Reed* v. *McCord* (*supra*) it is pointed out that if the defendant had merely stated what he had heard recited in his presence with regard to how the accident happened, it would not have been binding upon him. In the case at bar that is precisely what William Findlay is doing. He is testifying to what had been told to him by James Findlay and others in the household in Detroit at a time when there was no suspicion that any such person as Henry Brooks existed.

The decision in this case may properly stand upon the theory that William Findlay is the legitimate brother of the full blood of the decedent, John Findlay (Albert Brooks) and of the appellant, Alfred Brooks, since the record herein does not contain evidence rebutting the presumption of legitimacy of the individual whose legitimacy is attacked, *i. e.*, William Findlay, the respondent, the appellant having the burden in this respect, and does not contain

evidence of non-access on the part of Henry Brooks to Ann Aldridge during the requisite period prior to 1875 when William Findlay was born in England.

Accordingly the surrogate's finding upon this record to this effect should be sustained and the decree founded thereon should be affirmed, with costs to appellant and respondents payable out of the estate.

Present — LAZANSKY, P. J., RICH, HAGARTY, CARSWELL and SCUDDER, JJ.

Decree of the Surrogate's Court of Nassau county unanimously affirmed, with costs to appellant and respondents payable out of the estate.