HOLMES (ELLIOTT v.). See Case No. 4,-392.

HOLMES (GEAR v.). See Case No. 5,292.

## Case No. 6,638.

### HOLMES v. HOLMES et al.

[1 Sawy. 99; 1 Abb. (U. S.) 525.] [1]

Circuit Court, D. Oregon. April 12, 1870.

INADEQUACY OF PRICE — EFFECT ON SALE — MARRIAGE AT COMMON LAW—MARRIAGE, WHAT CONSTITUTES IT ACCORDING TO LAWS OF OREGON AND CALIFORNIA—MARRIAGES, WHEN VOID—COHABITATION NOT MARRIAGE —EVIDENCE OF PREVIOUS MARRIAGE — MARRIAGE, CONSENT NECESSARY TO—COHABITATION NOT SUFFICIENT EVIDENCE OF MARRIAGE TO FOUND CLAIM FOR DOWER THEREON — MARRIAGE, WITH THE CIRCUMSTANCES, SHOULD BE ALLEGED IN PLEADING.

1. Mere inadequacy of price is not sufficient to set aside a sale, but when such inadequacy is so great that the mind revolts at it, the court will lay hold of the slightest additional circumstance of advantage or oppression to rescind the contract.

[Cited in King v. French, Case No. 7,793; Parkhurst v. Hosford, 21 Fed. 834.]

2. Semble, that at common law, or in the absence of any statute prescribing the mode of contracting marriage, a contract to marry per verba de futuro cum copula, does not amount to a marriage in fact.

3. The laws of California (Hit. Dig. 4, 466) and of Oregon (Code Or. 783, 785) require that the consent of the parties to become husband and wife, must be declared in the presence of a person authorized by such laws to solemnize marriage, and two witnesses, and without the observance of these formalities the marriage relation cannot be created or entered into, in either of such states.

[Cited in Re McLaughlin's Estate, 30 Pac. 655.]

4. Where citizens of a state purposely go beyond its jurisdiction and not within the jurisdiction of another state—as at sea—and then contract marriage otherwise than in accordance with the laws of such state, the transaction is a fraudulent evasion of the laws to which the parties owe obedience, and, therefore, void.

5. Living together as man and wife, although evidence of a previous marriage, cannot make parties man and wife, nor can any length of cohabitation; however exclusive, ever constitute the relation of marriage.

6. Marriage, although arising out of contract or the consent of the parties, is a relation, as much so as that of parent and child, and such consent must be mutual and absolute per verba de praesente, not merely to live together exclusively, but to become joined to one another in the estate of matrimony.

[Cited in Sharon v. Hill, 26 Fed. 371.]

7. On a bill to enforce a claim to dower, cohabitation of complainant and deceased and other circumstances, examined and *held* not suf-

[1] [Reported by L. S. B. Sawyer, Esq., and by Benjamin Vaughan Abbott, Esq., and here compiled and reprinted by permission.]

ficient evidence of a previous marriage between them.

8. Where a woman claims to have been the wife of another, it is an insuperable objection to such claim, that the pleadings do not contain an allegation of a marriage to such other, with the circumstances of time and place, and that she withholds her testimony as a witness upon the same point.

In equity.

W. F. Trimble, David Logan, and Erasmus D. Shattuck, for complainant.

Walter W. Thayer, W. W. Page, and William Strong, for defendants.

Before FIELD, Circuit Justice, and DEADY, District Judge.

DEADY, District Judge. This is a suit in equity, brought by the complainant, styling herself Glervina O. Holmes, against Thomas J. Holmes, Jr., his brother Byron, his three married sisters—Mary A. Goodenough, Alice J. Strowbridge and Theresa Coulson—and their husbands, to cancel and set aside a certain deed executed by complainant to defendants, and for assignment of dower in the lands affected by the deed.

The bill was filed January 26, 1869, and alleges:

I. That the complainant is a resident and citizen of the state of California, and that the defendants, except Theresa and her husband, are citizens of the state of Oregon.

II. That Thomas J. Holmes, late of Portland, Oregon, died intestate on June 18, 1867, leaving as his children and heirs at law said Thomas J. Holmes, Jr., and his brother and sisters aforesaid; that "complainant was the lawful wife of the deceased and lived and cohabited with him as his wife from the —— day of December, 1865, to the time of his death;" "that during the said marriage" and at the time of his death, the deceased was seized in fee and possessed of certain blocks and lots of land in the city of Portland of the value of $100,000, the annual rents and profits of which are worth $10,000; that it was not necessary to sell any of said real property to pay his debts, but that the same was inherited by his heirs, who have since partitioned it among themselves; that "complainant is the widow of said Holmes, deceased," and by the laws of Oregon was and is entitled to dower in said real property; that the present value of such dower is not less than $25,000; that complainant has never been barred of her dower in said property, and that the same has never been assigned to her, but her right thereto is disputed by said heirs.

III. That said heirs pretend to have purchased and obtained a release of complainant's right of dower, by virtue of a certain deed signed by complainant, July 31, 1867, and by which complainant, styling herself Glervina O. Holmes, conveys to the heirs of Holmes, deceased, "all her right, title, interest, claim or demand, either in law or equity, as the widow of the said Thomas J. Holmes, or otherwise," in and to the estate of said Holmes, in consideration of the sum of $1,000, "and the further consideration that it was in his lifetime our wish and agreement before and in contemplation of marriage, that upon his, the said Thomas J. Holmes, death, all his property, both real and personal, should descend to his children, the heirs aforementioned, clear of and unencumbered with any claim of dower or any legal claim of myself in any manner whatever;" that said deed "was procured by said heirs to be executed by complainant through fraud, duress and undue influence exerted over her by said heirs, and especially by said Thomas J. Holmes, Jr., and J. M. Strowbridge," the husband of Alice J., aforesaid; and that the consideration of said deed "was grossly inadequate and the recitals therein contained false," and the same was imprudently executed, the complainant being ignorant of the value of her interest in the estate, and unadvised of the nature and effect of said deed.

IV. The bill then sets forth the circumstances and condition of the complainant, at and before the signing of the deed, at great length and with much minuteness, to the effect that the complainant, after the death of Holmes, continued to live in the home house, but that said heirs came there also and took possession; that said heirs then conspired with said J. M. Strowbridge to harass complainant and drive her away from said home and cheat her out of her interest "in the estate of her said husband;" that complainant was then poor and friendless, without means of support and "in great distress, mental and pecuniary," and without knowledge as to the value of the estate; that she did not sign said instrument freely, but through fear of said Strowbridge and Holmes, Jr., who, "in order to induce her to release her interest in said estate, falsely accused her of criminal intercourse with said Holmes, deceased, prior to his marriage with complainant and before the death of a former wife of said deceased, and represented to complainant that she was liable to a criminal prosecution, and unless she would give up her claim to said estate and leave the house and move out of the state, they would cause her to be prosecuted in the courts and held up to public scandal, infamy and disgrace, and to be punished by imprisonment; and that said Strowbridge and Holmes, Jr., made it a condition of said payment of $1,000, that the complainant should leave the state, and to that end said sum was made payable, $500 in Portland and the remainder in ten months after sight at Wells, Fargo & Co.'s in San Francisco.

On April 1, 1869, an answer to the bill was filed, purporting to be the answer of all the defendants except Mary A. Goodenough and her husband, but such pleading was not signed or sworn to by any of the defendants except Thomas J. Holmes, Jr. To this answer the plaintiff, on May 1, filed exceptions

for scandal and impertinence and insufficiency; which were afterwards heard and allowed by the court.

On August 21, the joint and several answer of all the defendants to the bill was filed, and on September 6 the complainant filed the general replication thereto.

By the amended answer, the defendants admit the allegations of the bill concerning the citizenship of the parties, the death of Holmes, the nature and value of the property of which he died seized, and its subsequent partition among the defendants, his heirs.

They deny that the complainant was ever the lawful wife of the deceased, or that he ever cohabited with her as his wife, or that he ever was married to her, or "that any relation created by marriage ever existed between them."

They admit the execution of the deed by the complainant to the heirs of the deceased for the consideration mentioned in the bill, but deny that the same was executed by her otherwise than of her own free will and accord.

They aver that for a long time prior to the death of the deceased the said Thomas J. Holmes and complainant "had been lewdly and lasciviously cohabiting together," and that upon the death of said Holmes complainant freely admitted to said heirs that she had never been married to deceased, and acknowledged that she had no claim on his estate. That she was only anxious to obtain sufficient means to go to her father, in Ohio, and leave the state quietly, without exciting comment upon her conduct in having lived illicitly with the deceased, and not desiring to be turned away penniless as a cast-off wanton, and that said heirs being also anxious to prevent the relation which had existed between their father and the complainant from becoming more notorious than possible, and to remove any cloud that might exist upon said estate by reason of said relation, it was mutually agreed between the parties, that the said heirs should pay said complainant the sum of $1,000, and that complainant should execute to said heirs the deed in question; and that in pursuance of such arrangement complainant executed such deed and not otherwise, and that the recitals therein contained were inserted at her special instance and request.

On January 6 and 7 the court heard the evidence of the parties, and on January 11, the cause was argued and submitted.

Two principal questions arise in the case: (1) Were the complainant and the deceased married to one another; and, (2) was the deed from the complainant to the heirs wrongfully obtained from her.

Assuming that complainant was the widow of Thomas J. Holmes, she was entitled to an interest in his property worth at the date of the deed $25,000. The mere money consideration of the deed—the sum of $1,000—is such a grossly inadequate price for property of that value, as to shock the conscience and confound the judgment of a man of common sense. The unprejudiced mind revolts at it, and can only conclude that some advantage must have been taken of the complainant's ignorance or necessities. But then again, the particular charges in the bill of oppression and conspiracy by the heirs and Strowbridge to defraud the complainant in this matter, are fully denied by the answer and altogether unsupported by the proof. There is no direct proof that complainant was well advised of the value of the property affected by the deed, but at the same time there is every reason to believe, from all the circumstances, that she must have known that it was worth many times what she was receiving for it.

Under what circumstances inadequacy of price will be sufficient to set aside a sale is well stated in two cases cited by counsel for complainant. In Hough v. Hunt, 2 Ohio, 502, the court says: "The rule in chancery is well established. When a person is encumbered with debts, and that fact is known to a person with whom he contracts, who avails himself of it to exact an unconscionable bargain, equity will relieve on account of the advantage and hardship. When the inadequacy of the price is so great that the mind revolts at it, the court will lay hold on the slightest circumstances of oppression or advantage to rescind the contract."

In Osgood v. Franklin, 2 Johns. Ch. 23, Chancellor Kent says: "There is no case where mere inadequacy of price, independent of other circumstances, has been held sufficient to set aside a sale made between parties standing on equal ground, and dealing with each other without any imposition or oppression. And the inequality amounting to fraud must be so strong and manifest as to shock the conscience and confound the judgment of any man of common sense."

When a person gives $25,000 worth of property for $1,000, as in this case, the inadequacy is so very gross, that the court ought to "lay hold on the slightest circumstance of oppression or advantage," to set aside the sale. The fact itself furnishes good ground to conclude that the party was laboring under some controlling necessity, or was oppressed or was ignorant of the true value of the property.

The true explanation of this matter is to be found in the solution of the question—was the complainant the lawful wife of the deceased? If she was, the inadequacy of the price is so gross and palpable that the inference is almost irresistible that the parties who procured her to sign the deed took advantage of her situation, ignorance or some particular circumstances in her relation to the deceased, to induce or compel her to do so, and thereby intentionally obtained an unconscionable advantage to themselves which they ought not to be allowed to retain.

On the other hand, if the parties were not married, but merely living together in an un-

lawful manner, the matter is easily explained. The complainant, in that case, being in fact not the widow of the deceased, but only his mistress, would not be entitled to any share or interest in his property, and the deed and the professed consideration therefor would be as stated in the answer, only a plausible and decent sort of a contrivance between the parties to make some pecuniary provision for the complainant so as to enable her to leave the country and at the same time, as far as possible, conceal from the general public the improper nature of the deceased's relations with her.

The question of marriage or no marriage is often an embarrassing one to decide, particularly when the evidence is wholly circumstantial and the question arises between the issue of the alleged marriage and third persons, after the parties themselves have passed away. In this case the proof is wholly circumstantial, and the question arises between one of the parties to the supposed relation and the heirs of the other. The suit is maintained by that party not for the purpose of establishing her status as the once wife now widow of the deceased, but for the more practical one of obtaining a widow's share of his property as against his children and heirs. In this view of the matter, it may be considered as a suit between the deceased and the complainant to determine a claim to property unembarrassed by any consideration of the consequences of such determination upon the status or rights of third persons.

The answer admits the cohabitation of the parties as alleged in the bill, but denies the marriage. The complainant produces no direct proof of marriage, but relies upon the circumstances attending and surrounding the cohabitation as sufficient, in connection with that fact, to warrant the inference that a marriage had in fact taken place between the parties, at some time subsequent to the complainant's going from Portland to San Francisco, to meet the deceased on his return from New York.

On the trial the complainant put in evidence four letters written by the deceased to herself while he was making a voyage to New York via the Isthmus, dated between October 15 and November 12, 1865, and also one dated December 3, 1865, purporting to be written by John Altman—who is claimed to be the father of complainant—to the deceased. The two sons of the deceased, Thomas J., Jr., and Byron, and his son-in-law, Strowbridge, were examined as witnesses, besides other persons not connected with the family, as to particular acts and declarations of the deceased concerning the complainant and his relations with her.

It appears that at the time of his death Thomas J. Holmes was about fifty years of age, and that the youngest of his children was then quite grown up. That for at least sixteen years he had lived in Portland, and until 1865 with a second wife, not the mother of any of his children, who then died. That the complainant is near forty years of age, and was never married, unless to the deceased. That a few years before 1865 she was living with one Capt. Lyle as his mistress, who then died without making any provision for her; and that afterwards, and before the alleged marriage with the deceased, she was an inmate of a brothel in Portland; and that during some portion of the year 1865, and both prior to and at and after the death of Holmes' second wife, he kept and maintained the complainant as his mistress, in a house belonging to himself, at the corner of C and Third streets, in the immediate vicinity of his home, and where his wife aforesaid and several children then lived.

After the death of Holmes' wife in August, 1865, and sometime in the early part of October of that year, the deceased left Portland on a voyage to New York. A portion of Holmes' children continued to reside in the home house. It was during this separation that Holmes wrote complainant the letters above-mentioned. After Holmes left for New York, complainant continued to live at the house at the corner of C and Third streets, at the charge and expense of Holmes, until in the December or January following, when, probably in pursuance of a suggestion from Holmes, she proceeded to San Francisco, to meet him on his return from New York. In the month of April, 1866, or thereabouts, both of the parties returned to Portland, and thereafter continued to live together in the home house of the deceased, until his death, on June 18, 1867—which was sudden and unexpected.

This is a substantial statement of the general circumstances disclosed in the testimony, which tend to show the condition of the parties at or for sometime prior to the period when the relation of marriage is said to have commenced between them, and their conduct towards one another afterwards.

Besides these there are some special circumstances upon which the complainant relies as testimony to show a marriage between herself and Holmes.

Sometime in the summer of 1866, or within two or three months after Holmes returned from New York, Mr. Lakin testifies that Holmes brought complainant to the store where he was employed, and introduced her to him as Mrs. Holmes, and told him to let her have what she wanted and he would pay for it. After this, witness "sold her a considerable number of goods." Sometimes she paid for them, and sometimes they were charged to Holmes. Once or twice witness delivered parcels at the home house on C street, and saw Holmes and complainant there, as if living together then. Witness had known Holmes well in Portland for fifteen years, but this was all he knew of his relations with the complainant or of any recognition of her as his wife, or otherwise.

A. P. Ankeny testified that he had known Holmes many years, and had had confiden-

tial conversations with him. That he knew nothing particularly of the complainant, but had known her on the street for two or three years before Holmes' death. Saw Holmes and her together on the street once, and once at Holmes' house. Some two, or three, or four months before Holmes' death, in general conversation with witness, Holmes referred to complainant as his wife, and remarked that he had spent more happy hours in the last six months, than for twenty years before. That within three or six months before Holmes' death, at the office at the theatre, at request of Holmes, witness, in company with another person, whose name is not remembered, signed a paper as a witness, which he supposed to be a will, and which Holmes then said, related to his effects, and that he had made provision for his wife, meaning the complainant. The statements of Mr. Ankeny were somewhat general and indefinite, and he did not profess to give the language of Holmes, but only the substance of it; besides, it is not unlikely, that in the lapse of time, he has in some degree, confounded his general impressions of the matter with the conversations themselves.

D. W. Williams testified that in June, 1866, he was commissioner of deeds, for California, and that Holmes asked him to come to his house and take his wife's acknowledgment to a deed for property in California. That he knew Holmes, but not complainant, and that he went to his house, and there Holmes introduced him to a person whom he called his wife, and who signed and acknowledged the deed as his wife. That Holmes also signed and acknowledged, and that both parties told him that the property in question belonged to the wife. That because of some informality in the deed it was returned and reacknowledged twice before him, under similar circumstances. The testimony of Mr. Williams was direct and certain, and it shows that either the parties were then, or supposed themselves to be husband and wife, or that they went through this proceeding before the commissioner for the purpose of producing the impression in this community that they were married, so as to prevent their cohabitation from giving rise to unpleasant comment and scandal, or it may have been that they had in some way held themselves out as husband and wife in California, and therefore the purchaser would not take the deed unless executed by Holmes, as well as the complainant.

Dr. I. A. Davenport testified that he had known Holmes for some time, and that he first became acquainted with complainant a few weeks before Holmes went to New York, in 1865. The complainant was then known by the name of "Clara," and Holmes had introduced her to witness by that name. Soon after Holmes' return from New York, witness said that he introduced complainant to him as his wife; but upon further examination he stated the occurrence in these words: "When Holmes asked me to go down to his house, I said how shall I address 'Clara?' and he said as Mrs. Holmes." The witness also testified that he was Holmes' physician, and that he visited the house in that capacity, and that the parties lived together as man and wife, up to the time of Holmes' death. It is apparent from the circumstances that Dr. Davenport was upon intimate and confidential relations with the deceased, and also the complainant. For instance, it appears from the correspondence of the deceased, that he repeatedly warns her against receiving visits from men during his absence, but he more than once commends witness to her, both as a physician and a friend. It also appears that witness is not upon good terms with Strowbridge and T. J. Holmes, Jr., and that he is very friendly to complainant and sympathizes with her. Supposing that at this time the parties really were married, it is singular that Dr. Davenport, the confidential friend of both parties, did not know it, and that he should ask Holmes on the way to the house—"How shall I address 'Clara?'" The very question implies that while he knew the parties were living together, yet that he had no reason to believe they were husband and wife, but was in doubt in what light Holmes wished his connection with the complainant thereafter to be regarded. For instance, whether, as in the past she was to be considered and treated under the professional name of "Clara," simply as his mistress, or whether he wished to impart to the relation some appearance of decency and legality by treating and addressing her as Mrs. Holmes. It is also remarkable, that although witness and Holmes were, as we may reasonably suppose, living in daily communication for more than a year after this marriage is alleged to have taken place, nothing appears to have ever been said about it between them, nor does it appear that Holmes in any way ever declared or intimated to witness that he had married complainant, or that she had ceased to be his mere mistress, except on the one occasion, when in reply to the direct inquiry, he told witness to address her as Mrs. Holmes.

Mr. Hamilton Boyd testified that he was well acquainted with Holmes in his lifetime, but did not know complainant. That he had a conversation with Holmes, in which H. asked him what he thought of his marriage, as the witness understood, referring to the complainant. Witness "tried to pass it off, and said he knew nothing about it." Holmes repeated the question. Witness replied "he had heard rumors to that effect, but he never believed them." Holmes did not then say that he was married, but repeated the question—"What do you think of my marriage?" to which the witness then replied—"It is in very bad taste"—whereupon the subject was dropped.

The testimony of this witness was distinct and unqualified. He and Holmes appear to have sustained friendly relations to one another, and no reason is apparent for any con-

cealment or mystery between them about any matter which in itself was lawful and proper. Holmes seems on this occasion, as on others, to have studiously avoided making an explicit admission that he was married to the complainant, while at the same time his conduct and expressions were calculated to give color to the impression or rumor that a marriage of some kind had taken place between them in California, before returning to Portland, in 1866.

The conversation itself is ambiguous and may be considered as evidence, either that a private marriage had taken place between the parties, about which Holmes was then feeling the pulse of his friends as to the propriety of making public, or else that there was no marriage, but some kind of a promise or understanding that there should be one, and he was endeavoring in this way, to ascertain how a marriage with such a person as the complainant would be regarded by his friends and the public.

In addition to these special circumstances, the complainant relies upon Holmes' letters to herself, as furnishing sufficient evidence of a promise to marry the complainant at some future time. Assuming the promise per verba de futuro to be so proved, it is maintained that this engagement and the subsequent copula, amount in law, to a present consent, and constitute sufficient evidence of marriage. The reason assigned for this conclusion is, that the law presumes the copula was allowed on the faith of the marriage promise; and that so the parties, at the time of the copula, accepted each other as husband and wife.

The proposition is substantially stated in the words of Bishop on Marriage and Divorce (section 90), where it is laid down that, in the absence of any statute requiring specified forms and ceremonies, a marriage is constituted by the mere consent of the parties, and that such consent is to be presumed when the copula follows upon a promise to marry in the future.

But this doctrine is directly denied in Cheney v. Arnold, 15 N. Y. 345. Denio, C. J., delivered the opinion of the court, which was concurred in by his associates. The syllabus contains the point of the opinion, and is as follows: "A contract to marry, per verba de futuro, though followed by copulation, does not amount to a marriage in fact. Such a contract, with cohabitation upon the faith of it, was ground for a decree enforcing a performance, by formal solemnization, in the ecclesiastical courts, and was for some purposes regarded as a valid marriage by the canon law, but, it seems, never constituted a valid marriage at common law."

It must be admitted that there are some dicta of American jurists to the contrary of this case, and in accord with the rule maintained by Bishop; but Cheney v. Arnold is later than these dicta, and carries with it the authority of an express adjudication. This is a vexed question, but I am much in-

clined to follow the opinion expressed by Chancellor Walworth, in Rose v. Clark, 8 Paige, 579, that at common law no marriage was valid unless celebrated in facie ecclesiae. In the earlier editions of Kent's Commentaries (part 4, p. 87), it was stated, that: "If the contract be made per verba de praesenti, and remains without cohabitation, or if made per verba de futuro, and be followed by consummation, it amounts to a valid marriage, which the parties (being competent as to age and consent) cannot dissolve, and it is equally binding as if made in facie ecclesiae." Upon this proposition the supreme court of the United States in Jewell v. Jewell, 1 How. [42 U. S.] 234, were equally divided and gave no opinion. In a later edition of the commentaries this proposition is materially qualified by inserting after the words—"it amounts to a valid marriage" in the absence of all civil regulations to the contrary. This qualifying clause is found as early as the seventh edition, published in 1851, while the case of Cheney v. Arnold was not decided until 1857. Modified by this clause—in the absence of all civil regulations to the contrary—the proposition in Kent amounts to nothing more, than that in a state of nature no particular form or ceremony is necessary to give validity to the consent of the parties to the contract to become husband and wife, and the same may be said of any other contract.

But admitting that the law upon this question is with the complainant, and that a contract per verba de futuro cum copula constitutes a marriage, is there any such contract in this correspondence? It will not be pretended that it contains any express promise to marry the complainant at any time, or an express admission that an engagement to marry ever existed between the parties. Nor do I think that any such promise or engagement can be reasonably inferred from the correspondence, when read by the light of the surrounding circumstances.

The correspondence consists of five letters, purporting to have been written by Holmes to complainant. They are dated October 15, 16, 24, 29, and November 12, 1865. The first two were written at San Francisco, immediately upon his arrival there; the next two on board the Golden City, between San Francisco and Panama, and the fifth and last one, at New York. The first one is incomplete, being evidently continued on a second sheet, which is not produced. The omission is unexplained, and the presumption is that the missing portion of the letter would not, if produced, be favorable to the complainant's case, but the contrary. There is no doubt about the authenticity of the letters. Mr. Shattuck, one of the complainant's attorneys, testified that he received the letters from the hands of his client, a short time before she left for San Francisco, and that she left for that place about one and a half months before this suit was commenced.

Byron Holmes also testifies that they are in the handwriting of his father.

The letters are addressed to "Dear Clara," and are quite voluminous. Their general character, is all that can be stated here. Here and there they contain expressions which readily admit of being understood in a gross and indecent sense. The language and sentiments of the correspondence, and the topics discussed in it, clearly indicate that the parties had been living in a state of concubinage or worse, and that the relation between them was a mere convention by which they agreed hereafter, to commit fornication only with one another.

The writer is constantly assuring the complainant of his continence and fidelity to her, notwithstanding the many strong temptations which surround him, and as constantly cautioning the complainant against visiting houses of prostitution, or entertaining other men at her house.

True, there are some expressions in the correspondence that may be construed as indicating that it was the purpose of the writer to marry the complainant when he returned, if her conduct was satisfactory during his absence. Among these, the strongest are, that he regretted that he had forgotten the kind of goods she wanted for a wedding-dress, but would get something. That "the woman I marry must conduct herself during my absence so as to be above suspicion." "If you wish to become an honored wife, you must not visit houses of prostitution." No engagement to marry is alluded to, nor is the word "wife," or "marriage," or "marry" used, except as above stated.

Considering the previous lives and relations of these parties, an actual promise to marry, cannot reasonably be inferred from this correspondence. At best, it is merely evidence of a purpose or understanding that thereafter the complainant would give up her former vocation, and live with Holmes, exclusively, as his mistress.

Another circumstance connected with the correspondence, remains to be considered. In the letter of Nov. 12, Holmes writes that he is about ready to return to Portland, but that he will first visit complainant's father, in Ohio, and that he would leave New York, for that purpose, on the 14th inst. Whether he went or not, does not directly appear, but I infer not. However, a letter is produced in evidence, dated "Felicity, Ohio, Dec. 3, 1865," addressed to "Mr. Thomas J. Holmes," and signed "John Altman," and endorsed in the handwriting of Holmes—"From John Altman tó Thomas J. Holmes." This letter came from the custody of the complainant with the others. It is brief, and begins by acknowledging the receipt of one from Holmes of "17th of November, with $20, enclosed, for which you will please accept my thanks," and proceeds—"you also desire my consent to a union with my daughter. Upon this delicate question I hope my consent

is given to a gentleman of honor, of kind heart and tender feelings, and that the result will be for the good and happiness of you both in the future. With these few lines, hoping to hear from you soon, I subscribe myself yours, respectfully."

It cannot be denied, that upon the face of this letter it is asserted that Holmes, in his, of the 17th of Nov., had in some way, made a proposal of marriage with "Altman's daughter." What her name was, and why the proposal was accompanied with the exact sum of $20, does not appear. But why is not the letter from Holmes containing this proposal produced? If received by complainant's father, it is presumed to be in his custody, and at her service. If it was lost or destroyed, she could have her father's deposition taken and prove that fact and its contents. The omission to do this is sufficient to cast suspicion upon the integrity of this so-called Altman letter.

Besides one would hardly think that Holmes would deem it necessary to ask permission of her father or any one else, unless it was his own family, to marry a person in the situation the complainant then was, and had been. Admitting, however, that the letter was written by complainant's father, in response to one from Holmes, asking her hand in marriage, it cannot be believed in the light of all the other circumstances, that either Holmes or the complainant ever seriously intended anything by such proposal, other than to make an impression upon some one. For instance, the complainant knowing, or having good reason to believe, that she was regarded at home, as a lost, or fallen woman, might have suggested or assented to this application as a means of restoring herself in some degree, in the estimation of her family and friends.

These are all the special circumstances relied upon by the complainant, to prove a marriage in fact, between herself and Holmes. Neither the time or place of the alleged marriage is stated in the bill, and in the argument for complainant it was claimed that it might have taken place, either in Oregon or California, or at sea, between here and Panama. Admitting that the marriage might have taken place where there were no civil regulations prescribing specified forms and ceremonies as necessary to give validity to the consent of the parties, in my judgment these circumstances are not sufficient to prove either a marriage per verba de futuro cum copula or per verba de praesenti.

The question of marriage or no marriage in this case, arises between one of the parties to the alleged relation, and the legal representatives of the other. The determination of it does not involve the rights or status of innocent third persons, who have honestly given credit to and acted upon the appearances of a marriage between the parties or who are the issue of such parties, under circumstances where marriage was even pos-

sible. The complainant claims one third of the property left by Holmes, as against his own children and natural heirs, upon the single ground that she was his lawful wife at the time of his death. The burden of proof is upon her, to show this fact, and it is not sufficient to show that there might have been a marriage, but she must prove the fact directly, by the evidence of those who witnessed the contract, or by such an array of circumstances as admit of no other reasonable conclusion. It must also be a lawful marriage, contracted or celebrated according to the law of the land. The complainant contributed nothing to the accumulation of this property. She is in no sense or degree the meritorious cause of it. She went from a brothel to live with the deceased, even while his second wife was still living, and was supported by him in ease and luxury for nearly two years. She bore him no children, and probably rather gained than lost by the transaction. This is the extent of her merit so far as this property is concerned. Whatever she is entitled to, the law gives her as the widow of the deceased, and not otherwise, and she cannot complain if she is required to prove with reasonable certainty, the fact upon which her claim rests—a marriage with the deceased.

Now, if any marriage ever took place between these parties, it must have been either in the state of Oregon or California. There is nothing in the evidence to warrant the conclusion that the parties ever met elsewhere, except on the steamer on the return voyage from San Francisco to Portland. This court takes judicial knowledge of the law of California. Upon the subject of marriage it provides: "No person shall be joined in marriage unless such person shall have first obtained a license therefor, from the clerk of the county court, * * * which license shall authorize any judge, etc., to celebrate and certify such marriage." Hit. Laws Cal. 4466.

This language is mandatory, and prohibits persons from being joined in marriage except upon the conditions therein prescribed.

The law of this state provides similarly: "Before any persons can be joined in marriage, they shall produce a license from the county clerk * * * directed to any person, etc., authorized by this act to solemnize marriage, and authorizing such person, etc., to join together the persons therein named, as husband and wife." Code Or. 785.

But what follows is still stronger and more direct: "In the solemnization of marriage no particular form is required, except that the parties thereto shall assent or declare in the presence of the minister, priest, or judicial officer solemnizing the same, and in the presence of at least two attending witnesses, that they take each other to be husband and wife." Code Or. 783.

The consent to become husband and wife —the contract out of which arises the relation—must be given as herein prescribed—before a person authorized to solemnize marriage, and in the presence of two witnesses. Without the observance of these formalities, the marriage relation, it seems to me, cannot be created within the states of Oregon and California, particularly the former. Neither ought it to be. To prevent fraud and litigation, the law wisely requires certain contracts to be in writing, and signed by the parties. A single rood of land cannot be conveyed except by the deed of the vendor. How much more important it is to society and individuals, that the contract upon which rests the marriage relation, the most important of all others, should not be made except with such attending circumstances and formalities as will serve to manifest the consent of the parties beyond question, and also preserve the evidence of it. For instance: If this marriage was contracted in Oregon or California, according to the laws of either state, it would have been done before some person authorized to celebrate marriage and make a record of it, by which the fact could be proven directly, and beyond dispute.

Nor do I think that citizens of this state, as the complainant and deceased were, can purposely go beyond its jurisdiction, and not within the jurisdiction of another state, as at sea, and there contract marriage contrary to its laws. Such an attempt to be joined in marriage is a fraudulent evasion of the laws to which the citizen of the state is subject and owes obedience, and ought not to be held valid by them.

In Milford v. Worcester, 7 Mass. 48, a certain man and woman came before a magistrate authorized to celebrate marriage, and requested him to marry them. He refused, but the parties then and there, in the presence of the magistrate and other witnesses, declared that they took one another for lawful husband and wife, each making to the other the vows and promises usual in contracting marriages. The statute does not require any form of words for the solemnization of marriage, but that the contract was to be solemnized before a justice of the peace or minister. The action was by the issue of these parties, claiming to be their legitimate children, and the question was, whether there was a valid marriage or not between their parents, and it was determined in the negative. Parsons, C. J., delivered the opinion of the court. In the course of it he says: "Marriage, being essential to the peace and harmony, and to the virtues and improvements of civil society, it has been, in all well regulated governments, among the first attentions of the civil magistrate to regulate marriages; by defining the characters and relations of the parties who may marry; so as to prevent a conflict of duties, and to preserve the purity of families, by describing the solemnities by which

the contract shall be executed, so as to guard against fraud, surprise and seduction; by annexing civil rights to the parties and their issue, to encourage marriage, and discountenance wanton and lascivious cohabitation, which, if not checked, is followed by prostration of morals and a dissolution of manners; and by declaring the causes, and the judicatures for rescinding the contract, when the conduct of either party and the interests of the state authorize a dissolution. A marriage contracted by parties authorized by law to contract, and solemnized in the manner prescribed by law is a lawful marriage; and to no other marriage are incident the rights and privileges secured to husband and wife, and to the issue of the marriage. It has been truly observed by the counsel for the plaintiffs. that a marriage engagement of this kind is not declared void by any statute. But we cannot thence conclude that it is recognized as valid, unless we render in a great measure nugatory all the statute regulations on this subject. But a marriage, merely the effect of a mutual engagement between the parties, or solemnized by any one not a justice of the peace or an ordained minister, is not a legal marriage, entitled to the incidents of a marriage duly solemnized. The woman, when a widow, cannot claim dower, nor the issue seizin by descent. Whether cohabitation, after such a pretended marriage, will subject either of the parties to punishment, as guilty of fornication, may depend on circumstances. If either of the parties were circumvented, and verily supposed the marriage legal, perhaps such party would be protected from punishment, on the general principle, that to constitute guilt, the mind must appear to be guilty. But every young woman of honor, ought to insist on a marriage solemnized by a legal officer, and to shun the man who prates about marriage condemned by human laws, as good in the sight of heaven. This cant, she may be assured, is a pretext for seduction: and if not contemned, will lead to dishonor and misery."

But I am aware that there are some loose dicta scattered through the books, to the effect that a mutual engagement to marry between parties capable of contracting marriage, is valid, and constitutes a marriage, although not entered into or made, according to the forms, and before the person prescribed by the local law, unless the same is thereby expressly declared void. Without in any degree assenting to this doctrine, let it be assumed for the moment to be the law applicable to this case, while we consider whether the circumstances justify the inference that any such engagement took place between these parties.

First, it must be borne in mind that under the circumstances there was little or no inducement for marriage between these parties. They had long passed the heyday and romance of youth. Their acquaintance did not commence in innocent and honorable courtship and love, but in a mercenary and criminal commerce. No innocent offspring bound them to one another, or appealed to them for protection and legitimacy. The deceased was a man in the decline of life, with a handsome fortune and a grown-up family of sons and daughters. With him the primary object of marriage—the procreation of children—had been long accomplished, and the secondary one—the avoiding of fornication—does not appear to have much concerned him. The complainant was also well advanced in years, and, considering her past career, was not likely to have sought marriage for either the primary or secondary object of that relation. In my judgment, the most reasonable inference from even the circumstances which are claimed to favor the hypothesis of marriage is, that the parties, after the death of Mrs. Holmes, agreed to live together as man and wife, that she was to be faithful to him, and he to her, as long as they lived, or remained connected. This, of course, was not an agreement then to marry,. but to live together like husband and wife. Holmes had wealth and a home, and she was poor and out of the pale of society. She had lived as the mistress of one man, and afterwards as a prostitute. As she appears, from the testimony, there is no reason why she should decline to be Holmes' mistress, or why he should go so far as to offer her marriage as a consideration for the exclusive enjoyment of her person or society.

The parties having agreed to live together upon this footing, it was only natural that in some respects, particularly when third persons were present or concerned, they should treat one another as man and wife. Besides, Holmes had lived long in this community, and may be expected to have had some regard for appearances, as well for his own sake as that of his children around him. Indeed, at times, for this reason, he may have seriously contemplated marrying the complainant; but when he sounded his friends about the matter, as in the conversation with Boyd, and heard their opinion of the propriety of it, he shrunk back or procrastinated the matter. He might also have intended to have made provision for her in case of his death, which was sudden, and, doubtless, many years before he expected it.

But this agreement to live together bound neither of them, nor did it change their status or relation to one another. Living together as man and wife, although evidence of a previous marriage, particularly so far as third persons are concerned, cannot make parties man and wife. Nor can any length of cohabitation, however exclusive, ever constitute the relation of mariage. Marriage, is a relation, as much so as that of parent and child. It is founded in contract—in the consent of the parties. That consent must be mutual and absolute per verba de praesenti.

—not merely to live together exclusively, but to become joined to one another in the estate of matrimony.

In Letters v. Cady, 10 Cal. 533, the plaintiff sued as the widow of Cady for a share of his estate. Her complaint avowed that in 1853 she "was keeping a restaurant and public saloon in Grass Valley, and that she had accumulated in this business five or six hundred dollars; that the deceased made proposals of marriage to her, which she accepted, and consented to live with him as his true and lawful wife; that in accordance with his wishes she relinquished her business, sold her property, 'and from thenceforth lived and cohabited with him as his wife, always conducting herself as a true and faithful and affectionate wife should do.'" There was a demurrer to the complaint. Field, J., delivered the opinion of the court. After stating the case as above, the opinion proceeds:— "These are all the averments respecting the marriage, and they are entirely insufficient. The facts alleged do not constitute a marriage. They are only prima facie evidence of a marriage. Living together 'as man and wife' is not marriage, nor is an agreement so to live a contract of marriage. From the character of the allegations, and the pregnant fact that the plaintiff does not even sue in her marital name, except under an alias, we are led to the inference that the arrangement between her and the deceased was intended to be temporary, and the connection one to which it would be a perversion of language to apply the name of marriage."

But there are other circumstances disclosed by the testimony, the necessary inferences from which are overwhelmingly against the hypothesis that any marriage, or contract of marriage, ever took place between these parties, besides the direct testimony of some of the defendants to the admissions of the complainant to the contrary.

Byron Holmes, the younger son of the deceased, testified that he lived in the home house with the parties from the time of their return from San Francisco, in the spring of 1866, to the death of his father; and that he never heard the complainant addressed or spoken of by the deceased or other person otherwise than as "Clara." That he never asked her, directly, if she was married to his father, but in conversation she often told him, both before and after his father's death, that she claimed none of his property, and in reply to a question from complainant's counsel, he swore positively that in a certain letter, written by deceased to witness from San Francisco, in March, 1866, he did not inform witness that he had married complainant, but did say to him "that he had not or would not marry her." The witness also said that he had not this letter in his possession, but would produce it if counsel desired, but its production was not insisted upon by complainant.

Thomas Holmes, Jr., and Strowbridge, the administrators of the estate, both testified that soon after the death of Holmes, and while complainant was still in the house of the deceased, they conversed with her about her right to administer upon the estate, and informed her that if she had a certificate of marriage with Holmes, her right to administer should not be questioned. At first she said she had a certificate, but had promised Holmes never to produce it or show it to any one; but upon further conversation she burst out crying and acknowledged that she had no certificate, and had not been married, and that it was the second time she had been fooled, or deceived. Said she desired to go to her father, near Cincinnati, and wanted to know if witnesses could not raise her a certain amount of money to go with. Of course the fact must not be overlooked, that these defendants have a large pecuniary interest in the result of this suit. But that does not necessarily discredit their testimony, although it furnishes a reason why it should be carefully considered and scrutinized. Judging from the manner of the witnesses, the intrinsic probability of their statements and the absence of any direct contradiction of them, I see no sufficient reason for not believing them.

A. Johnson, called by complainant, testified that he had known Holmes for about fifteen years, but did not know complainant. That he was quite intimate with him, but never heard him say anything particular about complainant, and never heard him refer to her as his wife, or speak of being married. Add to this, that it does not appear that any one ever visited or received them as husband and wife, or that they ever appeared in public together, and that notwithstanding all the friends and acquaintance, which Holmes, from his wealth and long residence must have had here, no one is produced who ever heard him say that he was married to the complainant.

The very fact that the complainant released all interest in the property of the deceased, worth $25,000, for the insignificant sum of $1,000, is itself enough to raise the presumption that she did not then believe herself the widow of Holmes, and legally entitled to one third of his property. True, she might not have been aware of the exact value of the property, but she must have known that Holmes was a man of considerable fortune, and that the dower of his wife was worth many thousand dollars. His wealth appears to have consisted almost wholly of town property in the city of Portland, and from her residence in the city, and intimacy with the deceased, she must have had a tolerably correct impression of the value of his estate. I am unable to discover anything in the evidence, or the circumstances of the parties to justify the conclusion that any advantage was taken of the complainant to obtain this release. She was of mature age, had seen the world, and was

not likely to have been prevented by shame or mortification from coming before the public and asserting her rights, if necessary. A woman with a reasonable claim for $25,000 upon a solvent estate of a deceased person need not want for friends to assert her claim, in this country. She appears to have had communication with persons outside of the family of the deceased. Dr. Davenport visited her more than once, and Ferry once. They both conversed with her privately. Ferry appears to have taken an interest in her, and advised her that the best friend she could have was a good lawyer, and doubtless would have procured her an interview with one at any time. Dr. Davenport appears to have been her friend, as well as physician, and if she had desired it, was abundantly capable, and doubtless willing, to aid her in the assertion of any right she might have had as the widow of Holmes. Indeed, there is not much room to doubt but that he knew, directly or indirectly, from the parties themselves, what the real relation between them was; and I am satisfied that if he had had reason to believe that complainant was ever married to Holmes, he would have counseled and assisted her to maintain her right as his widow. Taken altogether, considering particularly the gross inadequacy of price, this sale of dower must have been either brought about by the defendants obtaining some controlling and unconscionable advantage over the complainant, or else it was a mere amicable and plausible contrivance between the complainant and defendants to give the former an opportunity to leave the country with sufficient means for respectable appearances, and at the same time conceal from the public, as far as possible, the fact that she and their father had been living together in a state of concubinage. In support of the first proposition there is only the single fact of the gross inadequacy of price, and that is a sword that cuts both ways, while all the facts and presumptions of the case are either reconcilable with, or directly tend to establish the truth of the second one, and I have little doubt but that it is the correct conclusion from the premises.

In pursuance of this contrivance, and as part of it, the recitals concerning the complainant's agreement not to claim the property of the deceased were inserted in the deed, and she was also described therein and in the petition for letters of administration as the widow of Holmes. It can't be possible that any woman knowing herself to be the lawful wife of Holmes, and entitled to his name and one third of his comparatively large fortune, would quietly consent to relinquish all this for $1,000, and also to leave the country, under circumstances which she must have known and felt, were a tacit admission to the contrary.

But the insuperable objection to the theory of marriage in this case, arises from the silence of the complainant. If it be true that she was ever married to Holmes according to law, or that he ever attempted or pretended to marry her in any way, or by any means, or that he ever promised to marry her, the complainant knows it, and can state the fact with the essential circumstances of time and place. A woman is not likely to forget when and where she was married, whether according to the forms of law, or otherwise. In this case, there is every inducement for the complainant to state the fact, if it be a fact. Her honor and a fortune are depending upon it. That she is not insensible to the latter consideration, the bringing of this suit bears witness.

Yet she does not even state in her bill that she was married to Holmes. She only alleges in general terms, that she "was the lawful wife of the deceased, and lived and cohabited with him as his wife, from the —— day of December, 1865, to the time of his death." Whether she was "the lawful wife of the deceased," or not, is a question of law and fact, and no facts are stated on which to base the conclusion that she was, except that she "lived and cohabited with him as his wife"—that is like his wife, after the manner of a wife. Now, living with the deceased, however long or in whatever manner, would not make her his wife. Marriage is the legal result of a mutual and absolute engagement between the parties to be husband and wife. Prescription nor copula, either singly or combined, can never constitute marriage.

Again, the allegations in the bill, indefinite and unsatisfactory as they are, are not sworn to by the complainant. The bill, although it need not have been sworn to, is verified by one of complainant's solicitors, who upon this point speaks, of course, from mere information derived from the complainant.

But why does she not appear here as a witness or give her testimony by deposition, and inform the court particularly when and where and by what means she became the lawful wife of the deceased, and why, if such be the case, she released her dower, worth $25,000, for the paltry and inadequate sum of $1,000? The complainant is a resident of San Francisco, and there was nothing to prevent her from being a witness in the case, either in person or by deposition. The withholding of her testimony, under the circumstances, gives good ground for presuming that it would be adverse to her claim. She asks this court to infer from circumstances that she was the lawful wife of Holmes, when she declines to come forward and testify to the fact under the sanction of her oath.

This circumstance alone is enough to convince any one that whatever agreement or understanding there was between her and Holmes, as to living together—and I have no doubt there was some—they never were married, or engaged to be married, in any sense of the word.

A decree must be given dismissing the bill.

[In Case No. 3,274, a bill was filed to establish a trust in favor of Teresa E. Coulson and her two said sisters. Upon answer being made, certain exceptions thereto were allowed.]